*Eric Shapiro v. Hyperheal Hyperbarics*, *Inc*., No. 121, Sept. Term, 2023 & *Eric Shapiro v. Hyperheal Hyperbarics, Inc.,* et al., No. 1843, Sept. Term, 2022. Opinion filed on October 3, 2024, by Albright, J.


RES JUDICATA – COMPULSORY COUNTERCLAIMS – FEDERAL RULES ON COUNTERCLAIMS

Under Maryland's broad principles of res judicata, when a current plaintiff should have brought a claim as a compulsory counterclaim in a previous federal court case, the plaintiff is barred from bringing the claim in the present suit. Because the Federal Rules of Civil Procedure mandate that certain counterclaims be brought, a plaintiff must have brought any such a claim in the previous federal court case.

RETROACTIVE APPLICATION OF FEDERAL RULES OF CIVIL PROCEDURE IN STATE COURT

Maryland courts will apply the Federal Rules of Civil Procedure when determining whether a plaintiff in a state court case should have brought a compulsory counterclaim when they were a defendant in a previous federal court case.

STORED WIRED AND ELECTRONIC COMMUNICATIONS AND TRANSACTION RECORDS ACCESS ACT – VIOLATION OF ACT

Under Maryland's Stored Wire and Electronic Communications and Transaction Records Access Act, the download of an email account from a computer that has authorized access onto a separate hard drive that does not have authorized access constitutes obtaining or altering access to a wire or electronic communication while it is in electronic storage in an electronic communications system by intentionally accessing it without authorization or intentionally exceeding authorization to access it. Therefore, a download under these circumstances is a violation of the Act.

STORED WIRED AND ELECTRONIC COMMUNICATIONS AND TRANSACTION RECORDS ACCESS ACT – DEFINITION OF FACILITY

Under Maryland's Stored Wire and Electronic Communications and Transaction Records Access Act, a Gmail server qualifies as a facility where electronic communications are stored.

CORPORATIONS AND ASSOCIATIONS – INDEMNIFICATION – MANDATORY INDEMNIFICATION

For a corporate director or officer to be awarded mandatory indemnification by a court under Maryland Code, Corporations & Associations 2-418, the underlying action must have been brought against the director or officer by reason of their service in their capacity as a director or officer. If the underlying action is directed at the director or officer in either capacity, the action is brought against the director or officer by reason of their service in their capacity as a director or officer.

CORPORATIONS AND ASSOCIATIONS – INDEMNIFICATION – MULTIPLE POSITIONS

When someone is sued in multiple corporate capacities, one or more of which is indemnified and one or more of which is not indemnified, they may be indemnified for being sued in their indemnified capacity. Being sued in their non-indemnified capacity does not itself limit their ability to obtain indemnification.

CORPORATIONS AND ASSOCIATIONS – INDEMNIFICATION – CONDUCT REQUIREMENTS

When a director or officer successfully defends themselves in the underlying proceeding and sues for mandatory indemnification under Maryland Code, Corporations & Associations 2-418(d), they do not additionally need to meet the conduct requirements set forth under subsection (b). The statute provides that successfully defending themselves is enough.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1843
September Term, 2022

No. 0121
September Term, 2023

_____

ERIC M. SHAPIRO

v.

HYPERHEAL HYPERBARICS, INC., ET AL.

_____

Tang,
Albright,
Kenney, James A., III
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Albright, J.

_____

Filed: October 3, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# TABLE OF CONTENTS

FACTUAL BACKGROUND ..................................................................................... 6

    I.    Parties and Background Facts ................................................................. 6

    II.   Mr. Shapiro's First Round of Employment and the "Tricare Problem" .................. 8

    III.  Mr. Shapiro's Second Round of Employment ........................................ 11

EMPLOYMENT AND EMAILS SUIT ................................................................ 13

Procedural Background ........................................................................................ 13

    I.    HHI's IP Suit Against Mr. Shapiro ...................................................... 13

    II.   Mr. Shapiro's Employment and Emails Suit Against HHI ................... 14

        A.   Dismissal of Counts I & II ............................................................. 16

        B.   Summary Judgment on the Email Claims ...................................... 18

Discussion ............................................................................................................ 22

    I.    Employment Agreement ...................................................................... 22

        A.   Standard of Review ....................................................................... 22

        B.   Analysis ........................................................................................ 23

    II.   Emails .................................................................................................. 32

        A.   Standard of Review ....................................................................... 32

        B.   Analysis ........................................................................................ 34

INDEMNIFICATION SUIT ................................................................................ 45

Procedural Background ........................................................................................ 45

    I.    HHI's Fraud Suit Against Mr. Shapiro ................................................ 46

    II.   Mr. Shapiro's Indemnification Suit Against HHI ................................ 47

Discussion ............................................................................................................ 49

    I.    Indemnification .................................................................................... 49

        A.   Standard of Review ....................................................................... 49

        B.   Parties' Contentions ...................................................................... 51

        C.   Analysis ........................................................................................ 53

            1.   The Capacity Requirement ...................................................... 54

            2.   Subsection (b)'s Improper Conduct Provision ........................ 72

CONCLUSION ..................................................................................................... 79

Appellee Hyperheal Hyperbarics, Inc. ("HHI") provides hyperbaric oxygen therapy to patients in Maryland. At different times, Appellant Eric Shapiro was a director, a majority shareholder, a corporate officer, and an employee of HHI. By our count, the parties have brought a total of seven lawsuits against each other, although many of the legal arguments throughout these suits are obscured by personal attacks by both parties and stories that are inconsistent even within themselves. After much strife among them, the matter has returned to this Court in the form of two cases, which we have consolidated.

We start by listing the lawsuits relevant to our discussion: [1]

- *United States ex rel. Schrum, et al., v. HyperHeal Hyperbarics, Inc., et al.*, Case No. 1:16-CV-00541-RDB ("the Qui Tam Suit")

- *Hyperheal Hyperbarics Inc v. Shapiro, et al.*, Case No. 03-C-18-004269 ("the Fraud Suit")

- *Hyperheal Hyperbarics, Inc. v. Shapiro*, Case No. 1:18-CV-01679-RDB, 404 F. Supp. 3d 953 (D. Md. 2019) ("the IP Suit")

---

[1] In consideration of time, space, and judicial economy, we do not discuss Mrs. Shapiro's case, *Michelle Shapiro v. Hyperheal Hyperbarics, Inc.*, No. 1257, Sept. Term, 2020, 2022 WL 2800976 (Md. Ct. Spec. App. July 18, 2022), on which we have already issued a ruling; or the Accounting Case, *Eric Shapiro v. Samer Saiedy, M.D., et al.*, C-03-CV-19-003872, which is ongoing. We also do not discuss an eighth case, litigated in the U.S. District Court for South Carolina. *Hyper Healing, LLC v. Shapiro*, No. 2:19-CV-3583-BHH, 2021 WL 4483034 (D.S.C. Sept. 30, 2021). In that case, Mr. Shapiro was again a party because he attempted to sell intellectual property rights (that he had already assigned to HHI) to two unrelated hyperbaric companies; HHI was not a party to this case.

- *Eric M. Shapiro v. Hyperheal Hyperbarics, Inc.*, ACM-REG-1843-2022 ("the Employment and Emails Suit") (at issue here)

- *Eric Shapiro v. Hyperheal Hyperbarics, Inc.*, ACM-REG-0121-2023 ("the Indemnification Suit") (at issue here)

The two cases underlying this appeal are Mr. Shapiro's Employment and Emails Suit and Mr. Shapiro's Indemnification Suit. In the Employment and Emails Suit, Mr. Shapiro alleged that when HHI terminated him (the second time), it did so wrongfully and failed to pay him all the wages he was due under his employment agreement. HHI disputed this by arguing that during the IP Suit, the court established that HHI had fully performed all its obligations to Mr. Shapiro under the contract, making the issue already decided and thus barred by res judicata and collateral estoppel. Mr. Shapiro also alleged in the Employment and Emails Suit that after his termination, HHI wrongfully accessed his personal email account and viewed and downloaded his emails. He claimed that HHI was able to do so because he had previously logged into his personal email account on HHI computers. HHI claimed that it never wrongfully accessed Mr. Shapiro's post-termination emails.

In the Indemnification Suit, Mr. Shapiro alleged that HHI had to indemnify him for his defense of the Fraud Suit, which HHI brought for the purpose of receiving indemnification[2] from Mr. Shapiro for its settlement in the Qui Tam Suit. Mr. Shapiro

---

[2] As we discuss below, in the Fraud Suit, HHI alleged that Mr. Shapiro was liable to HHI for the losses it suffered in having to repay payments HHI had received in an allegedly fraudulent billing scheme.

alleged that under § 2-418 of Maryland's Corporations and Associations Article ("C&A § 2-418"), HHI had sued him in his capacity as a director or officer, and because he had successfully defended that suit, HHI owed him indemnification. HHI responded that Mr. Shapiro was not entitled to indemnification because HHI had not sued him in his capacity as a director or officer and because he had acted in bad faith and received an improper personal benefit.

Although the background facts are lengthy and complex, they are necessary for the understanding and resolution of each of the issues. For example, to determine whether the circuit court properly dismissed Mr. Shapiro's employment counts because they were barred by principles of res judicata and collateral estoppel, we must examine the IP Suit HHI brought against Mr. Shapiro. To determine whether Mr. Shapiro is owed indemnification, we must examine the Fraud Suit and the Qui Tam Suit because Maryland's indemnification statute requires a review of the underlying case.

We proceed by identifying the questions presented. We then introduce the parties and interested persons in the cases. Next, we summarize the history among the parties that has led to the present cases. Then, we return to the two cases on appeal before us—the Employment and Emails Suit and the Indemnification Suit.

Pertaining to Mr. Shapiro's claim for violation of his employment agreement, he presents the following question,[3] which we have reworded:

_____

[3] Mr. Shapiro presented this question in his brief as:

3

1. Did the circuit court err in dismissing Mr. Shapiro's employment counts because they were barred by collateral estoppel?

On Mr. Shapiro's claim regarding his emails, he presents the following question,[4] which we have reworded:

2. Did the circuit court err in granting summary judgment in favor of HHI on the basis that there was no evidence showing the emails had been viewed?

Finally, on his indemnification claim, Mr. Shapiro presents the following question,[5] which we have reworded and consolidated:

---

A. Did the Circuit Court err in relation to the dismissal of Counts I and II of the Complaint on the basis of collateral estoppel?

[4] Mr. Shapiro presented this question in his brief as:

B. Did the Circuit Court err in relation to the granting of summary judgment to Appellees on Shapiro's claims concerning Appellees' unauthorized access of his personal emails on the basis that there was no evidence showing that the emails had been viewed?

[5] Mr. Shapiro presented his questions in his brief for the Indemnification Suit as:

1. Did the Circuit Court err when it failed to apply the plain meaning of Md. Code, Corps & Ass'ns § 2-418 in this case?

2. Did the Circuit Court err when it misconstrued how the various subsections of Md. Code, Corps & Ass'ns § 2-418 interrelate?

3. Did the Circuit Court fail to properly interpret Md. Code Corps & Ass'ns § 2-418 in conjunction with the Eight Article of HHI's Articles?

4. Does Md. Code, Corps & Ass'ns § 2-418(d)(1) mandate a corporation indemnify any director [or officer per (j)(1)] made a party to a proceeding by reason if his service within the corporation, if he is successful in the proceeding?

4

3. In granting summary judgment in favor of HHI, did the circuit court err in concluding that HHI did not bring the Fraud Suit against Mr. Shapiro by reason of his official capacity as a director or officer and that, although he succeeded in his defense in the Fraud Suit, Mr. Shapiro was still required to meet the conduct requirements of § 2-418(b)?

For the reasons below, we answer question one "no" and affirm the circuit court's judgment to the extent that it dismissed Mr. Shapiro's employment counts. We answer

---

5. Does Md. Code, Corps & Ass'ns § 2-418(j) extend the same right to indemnification afforded to directors in § 2-418(d)(1) to corporate officers?

6. Is the phrase "by reason of service in that capacity, as used in Md. Code, Corps & Ass'ns § 2-418(b)(1), so broad that it applies to any director, whether past or present who is sued related to corporate business without any additional nexus being required?

7. Are the permissive indemnifications [*sic*] provisions of §§ 2-418(j)(2) & (3) rendered mandatory because the Eighth Article of HHI's Articles requires indemnification "to the fullest extent permitted by and in accordance with the laws of the State of Maryland"?

8. Does Appellant satisfy the criteria to be indemnified under Md. Code, Corps & Ass'ns § 2-418(j)(1) merely by reason of his being an officer who is sued in that capacity without any additional causal connection being required?

9. Did the Circuit Court misinterpret and misapply Maryland Supreme Court's ruling in *Kramer v. Liberty Prop. Tr.*, 408 Md. 1, 968 A.2d 120 (2009)?

10. Did the Circuit Court err when used its own made up definition of "Party" instead of one in sec 2-418(a)(6) to derive its novel reading of § 2-418(d)? (footnotes omitted)

question two "no" in part "yes" in part. Thus, we affirm the circuit court's grant of summary judgment for HHI on two of Mr. Shapiro's three email counts; however, we reverse the grant of summary judgment on the third email count. We answer question three "yes" and reverse the court's grant of summary judgment in HHI's favor in the Indemnification Suit.

FACTUAL BACKGROUND

## I. Parties and Background Facts

We begin with the relevant parties in the two suits before us, together with some background information, all in order to provide a framework for the later litigation. Mr. Shapiro founded HHI in 2012 to provide hyperbaric oxygen therapy ("HBOT"). HBOT involves breathing 100% oxygen—as opposed to the normal level of 21%— in a special chamber. *See Hyperbaric Oxygen Therapy*, FDA, https://www.fda.gov/consumers/consumer-updates/hyperbaric-oxygen-therapy-get-facts (last visited Mar. 28, 2024) (explaining HBOT and the FDA's regulation of it). The treatment can help the body heal and fight certain infections.[6]

According to HHI, only a licensed physician may create an HBOT patient treatment plan and supervise its administration. Mr. Shapiro was a licensed HBOT

---

[6] It is also sometimes used for combatting post-traumatic stress disorder ("PTSD"), but that use is not approved by the FDA. *See id.*; Keren Doenyas-Barak, et al., *The Use of Hyperbaric Oxygen for Veterans with PTSD: Basic Physiology and Current Available Clinical Data*, 71 Frontiers Neurosci. (2023) (conducting a literary review on the effect of HBOT on PTSD in veterans). *But see* H.R. 3649, 118th Cong. (2023) (proposing a pilot program within the Department of Veterans Affairs for HBOT treatments to help veterans with traumatic brain injuries or PTSD).

technician but not a physician. Therefore, he could administer the treatments under a physician's supervision, but he could not create patient care plans or supervise the treatments himself. Also, as an HBOT technician, he was an employee of HHI.

Upon founding HHI, Mr. Shapiro was also the CEO, the majority shareholder, the President, and one of three directors. A few years after its founding, in 2015, HHI filed an amended corporate charter, which obligates HHI to indemnify HHI directors and officers under some circumstances. By that point, Mr. Shapiro had stepped down as President.

Mr. Shapiro brought the Indemnification Suit solely against HHI, which is now the appellee in that matter. However, Mr. Shapiro's Employment and Emails Suit includes multiple other appellees in addition to HHI. The other appellees all had some connection to HHI. They were Dr. Samer Saiedy, Maryland Vascular Specialists ("MVS"), Laurence Abramson, Jennifer Parmenter, Amber Dorn, and Scott Hughey. Mr. Shapiro alleged in his complaint that all defendants were acting in their respective capacities as agents, servants, or employees of HHI.

Today, HHI's majority shareholder is Dr. Saiedy. When the Employment and Emails Suit was pending below, Dr. Saiedy also served as an HHI director and HHI's President.[7] Dr. Saiedy became President after Mr. Shapiro left that role. Dr. Saiedy is also the owner and operator of MVS.[8] Mr. Shapiro is HHI's only minority shareholder.

---

[7] It is not clear whether Dr. Saiedy is an HHI director and its President now.

[8] MVS is Dr. Saiedy's medical practice, which includes Dr. Saiedy and other physicians.

7

The other appellees in the Employment and Emails Suit are former employees of HHI. Mr. Abramson was the Chief Operating Officer and a director alongside Mr. Shapiro and Dr. Saiedy. Ms. Parmenter was the Accreditation Director. Ms. Dorn was HHI's former billing specialist, who conducted an audit of HHI's records. Mr. Hughey was HHI's former Director of IT, who assisted Mr. Shapiro with his email.

In 2012, Mr. Shapiro hired a third-party billing company for HHI. Lesa Schrum was an employee at the third-party biller and managed HHI's account. Ms. Schrum later became a relator in the Qui Tam Suit, discussed *infra*, against HHI and Mr. Shapiro. The other relator in that suit was Juliette Skelton, who was HHI's former office manager. Both Ms. Schrum and Ms. Skelton worked under Mr. Shapiro's supervision.

## II.     Mr. Shapiro's First Round of Employment and the "Tricare Problem"[9]

The "Tricare Problem"[10]—a fraudulent billing dispute between HHI and the United States—was the proverbial rock that started the avalanche. HHI settled the resulting Qui Tam Suit, but then it sued Mr. Shapiro in the Fraud Suit, alleging he was liable for fraud and to indemnify HHI for its settlement payment as a direct result of his alleged fraud. We review the Tricare Problem here because, after Mr. Shapiro prevailed

---

[9] The following facts are drawn from various sources throughout the records, including deposition transcripts, trial transcripts, medical forms, and insurance forms.

[10] According to its website, Tricare is "the health care program for uniformed service members, retirees, and their families around the world." *About*, Tricare, https://www.tricare.mil/About (last updated Oct. 23, 2023).

in HHI's Fraud Suit, he sought indemnification for his defense of it by bringing the Indemnification Suit, which is one of the cases on appeal before us now.

In 2013, Mr. Shapiro, through HHI, began to treat the patient ("Patient"). Patient was a 37-year-old woman, who was active in the military and suffered from PTSD. Shapiro claimed that Patient's doctor sent HHI a prescription for Patient's HBOT, but the doctor denied this.

HHI sent a request, signed by Mr. Shapiro, to Tricare for Patient's treatments, which Tricare approved. Mr. Shapiro then drafted Patient's care plan. Mr. Shapiro started the HBOT treatments for Patient in 2013.

Who supervised Patient's treatments is still disputed. Although Patient initially said she was never seen by a licensed physician at HHI, she later corrected that statement to say she was.[11] HHI's own records also often conflicted, at times listing one of HHI's doctors, and at different times listing "Dr. Shapiro" or "Dr. Juliette S." Who was listed as supervising physician also often conflicted with the physician who was paid for the treatments. Sometimes, Dr. Mavrophilipos or Dr. Leneau would get paid, and sometimes, one of the doctors from MVS, Dr. Saiedy's practice, would get paid.

On November 11, 2014, Tricare notified HHI of a payment by Tricare to HHI for HBOT treatments for Patient that she did not attend. Following that notification, HHI had two audits conducted: one by Ms. Dorn and one by Ms. Schrum. In her audit, Ms. Schrum discovered that Patient had failed to attend several HBOT sessions from March

---

[11] Because of Patient's PTSD, she suffered from some memory loss.

2013 through October 2014 despite Tricare paying HHI for those sessions.[12] Ms. Schrum also learned of several fraudulent practices through discussions with Ms. Skelton about HHI's operations. She then notified the officers, directors, and shareholders of the findings from her audit. In June 2015, HHI repaid Tricare for the HBOT sessions that Patient did not attend. This payment constituted HHI's first of three repayments to Tricare ("2015 Tricare Payment").

Unbeknownst to HHI or Mr. Shapiro at the time, in February 2016, Ms. Schrum and Ms. Skelton filed the Qui Tam Suit against HHI and its directors (including Mr. Shapiro) in the U.S. District Court for the District of Maryland. The suit alleged that HHI violated the False Claims Act. According to the complaint in the Qui Tam Suit, Ms. Schrum and Ms. Skelton had both cooperated with Tricare to investigate the overpayment until they were both terminated, allegedly because of that cooperation. The complaint alleged various patterns of fraudulent behavior in HHI's operations.[13] The U.S. Department of Justice ("DOJ") opened an investigation into HHI's allegedly fraudulent practices.

---

[12] Tricare's payments were deposited into HHI's corporate bank account, which Mr. Shapiro used as his personal bank account at the time.

[13] The complaint went so far as to claim that "every physician supervision claim submitted by [HHI] was fraudulent, and the practice likely continues today." The complaint concluded that "[i]n essence, all of the claims ever submitted by [HHI] were fraudulent in one way or another."

On October 21, 2016, Mr. Shapiro was terminated from HHI. The record is unclear exactly why Mr. Shapiro was fired at this time.[14] Mr. Shapiro remained a minority shareholder of HHI.

### III. Mr. Shapiro's Second Round of Employment

Mr. Shapiro's second round of employment, including his employment agreement and his eventual termination, triggered the sequence of events that culminated in the Employment and Emails Suit, which is also on appeal before us. The facts of his second round of employment are thus relevant to our analysis below. On March 6, 2017, HHI rehired Mr. Shapiro as an HBOT technician only. Under the terms of his reemployment, he agreed to relinquish and transfer various items of intellectual property to HHI. Further, he agreed not to act or speak on behalf of HHI or participate in social media or marketing on behalf of HHI.

Mr. Shapiro was to receive a salary of $80,000, which would increase to $100,000 after six months and $120,000 after one year. He also agreed to forgive a $137,000 loan that HHI owed him. HHI had the option to terminate Mr. Shapiro with cause in its sole discretion or without cause upon 90 days' written notice. Mr. Shapiro also agreed to be bound by the Employee Handbook, the most recent of which had been instituted in 2016 prior to Mr. Shapiro's reemployment. Although there is some debate as to whether he

---

[14] At a hearing, Mr. Shapiro stated he was terminated "because Dr. Saiedy said that nobody wanted [him] to come back to the company and that [Dr. Saiedy] would find a way to bring [Mr. Shapiro] back sometime in January." At a deposition, Mr. Shapiro said, "There was an incident. I left."

11

received this handbook, his signature appears on a paper confirming his receipt of the handbook. During Mr. Shapiro's second round of employment, he used HHI's computers and network to check his personal email.

In January 2018, DOJ notified HHI that it was commencing an investigation regarding HHI's treatment of Patient.[15] On January 22, 2018, Mr. Shapiro was placed on administrative leave. Two months later, on March 23, 2018, HHI terminated Mr. Shapiro for the second time. HHI informed Mr. Shapiro of his termination in an email to his then-counsel that stated his termination was "[p]ursuant to . . . [employment agreement provision] 'Termination by HH – Without Cure Period', section d[.]" Section d of that provision provided that HHI could terminate Mr. Shapiro "in its sole discretion" if he engaged in "unprofessional, unethical, or fraudulent conduct."

Also in March 2018, HHI repaid $114,640.25 to Tricare to try to rectify the situation. This was its second of three repayments to Tricare, with its third being its settlement payment in the Qui Tam Suit.[16]

---

[15] In January 2018, Mr. Shapiro entered into a collaboration agreement with HHI, which lasted until that March. Mr. Shapiro said that upon terminating the collaboration agreement, Dr. Saiedy "demand[ed]" Mr. Shapiro sell him his shares. Then, three days after the agreement's termination, HHI terminated Mr. Shapiro.

[16] HHI and the DOJ entered into a settlement agreement in May 2019. Pursuant to the agreement, HHI was to repay another $300,000, including $207,000 of restitution. The U.S. Attorney's Office then issued a press release concerning the investigation that said HHI, through Mr. Shapiro, had fraudulently submitted the Tricare claims.

## EMPLOYMENT AND EMAILS SUIT

## Procedural Background

### I.      HHI's IP Suit Against Mr. Shapiro

The judgment in the IP Suit formed the basis for the circuit court's partial dismissal of the Employment and Emails Suit as barred by collateral estoppel. Thus, we next review the IP Suit to inform our analysis of the circuit court's dismissal. Pursuant to his employment agreement, when Mr. Shapiro was rehired, he relinquished to HHI his rights to HHI's intellectual property. After his second termination, Mr. Shapiro attempted to control some of HHI's intellectual property, including the trademark, websites, and social media. Upon discovery of Mr. Shapiro's activities, HHI sent him a cease-and-desist letter. When he did not cease and desist, HHI filed the IP Suit in the Circuit Court for Baltimore County for breach of his employment agreement, among other counts. *HHI*, 404 F. Supp. 3d at 957-58.

The circuit court issued a temporary restraining order concerning Mr. Shapiro's attempts to control HHI's intellectual property. Soon after, Mr. Shapiro successfully removed the case to the U.S. District Court for the District of Maryland (the "U.S. District Court") on the basis of federal question jurisdiction. After a hearing, the U.S. District Court issued a preliminary injunction restraining Mr. Shapiro from controlling the contested intellectual property until a final judgment. *Id.* at 961.

The U.S. District Court granted HHI summary judgment. It concluded that Mr. Shapiro breached the employment agreement and ordered specific performance of it by

13

keeping Mr. Shapiro from "attempting to control or use the name 'Hyperheal' in the state of Maryland[.]"[17] *Id.* at 972-73. In its accompanying Memorandum Opinion, the court explained that "a party seeking specific performance must be able to show that he has fully, not partially, performed everything required to be done on his part." *Id.* at 968. It continued, "[t]here are no contentions that Hyperheal has failed to perform its obligations under the Employment Agreement." *Id.* Because of that, it held that HHI "shall be granted specific performance to the extent that it can be achieved." *Id.*

About a week after the court issued its opinion, the rest of the IP Suit was voluntarily dismissed with prejudice, but the permanent injunction remained in place. The specific performance order is how the IP Suit is linked to Mr. Shapiro's Employment and Emails Suit, one of the two cases before us here.

## II.    Mr. Shapiro's Employment and Emails Suit Against HHI

Mr. Shapiro filed his Employment and Emails Suit in March 2021. In his complaint, Mr. Shapiro lodged nine counts against the defendants, five of which are on appeal before us. Those counts on appeal are breach of contract (Count I), violation of Maryland Wage Payment and Collection Law (Count II), invasion of privacy (intrusion upon seclusion) (Count III), violation of the Stored Wire and Electronic Communications and Transaction Records Access Act [hereinafter "Stored Electronic Communications

---

[17] The parties stipulated that the employment agreement was binding and that Mr. Shapiro was properly terminated for cause under the employment agreement "for purposes of [the IP Suit] only[.]" Mr. Shapiro does not address the impact of, or otherwise rely on, this stipulation here.

14

Act" or "SECA"] (Count V), and violation of the Maryland Wiretapping and Electronic Surveillance Act (Count VI).[18] These counts can be split into two categories.

Counts I and II, breach of contract and violation of Maryland wage law, (Mr. Shapiro's "employment counts") both pertain to the fulfillment of Mr. Shapiro's employment agreement for his second round of employment. Mr. Shapiro only asserted these counts against HHI. In his complaint, Mr. Shapiro alleged that HHI had no cause to terminate him and acted unreasonably and without a factual basis for doing so. He also claimed that HHI owed him pay for his unused vacation and sick days, for the 90-day termination notice he claimed HHI should have given him, and for the scheduled increase in his salary that would have started the month he was terminated. He alleged that these actions breached his employment agreement and violated Maryland wage law.

Counts III, V, and VI[19] (Mr. Shapiro's "email counts") pertain to Mr. Shapiro's claim that after his termination, HHI and the individual defendants wrongfully accessed his personal email account.[20] In his complaint, Mr. Shapiro alleged that about a year after his termination, he was made aware that notifications for emails to his personal email account continued to pop up on HHI computers. He claimed that he had logged into his

---

[18] Counts VII, VIII, and IX concern personal property Mr. Shapiro left at HHI upon his termination; however, he did not appeal the dismissal of these counts.

[19] Mr. Shapiro did not appeal the dismissal of Count IV, unreasonable publicity given to private life.

[20] Later, at a hearing, Mr. Shapiro specified that he only contested the alleged viewing of emails that his personal email account received *after* he was terminated, which we refer to as his post-termination emails.

15

personal email account on the HHI computers when he was employed, but he said he logged out every time. Based on these facts, an affidavit from IT Director Mr. Hughey, and an investigation by a technology consultant, Mr. Shapiro alleged that each of the individual defendants (and thus HHI, since they were acting in their official capacities) had accessed his emails unlawfully. He alleged that by doing so, they invaded his privacy (intrusion upon seclusion), and violated the Stored Electronic Communications Act, *see* Md. Code, Cts. & Jud. Proc. ("CJP") §§ 10-4A-01 & 10-4A-08, as well as the Maryland Wiretapping and Electronic Surveillance Act (the "Wiretap Act"), *see* Md. Code, CJP §§ 10-401, 10-402, & 10-410.

### A. Dismissal of Counts I & II

HHI soon filed a motion to dismiss. It argued, among other theories, that Counts I and II, concerning Mr. Shapiro's employment agreement and HHI's termination of him, were barred by collateral estoppel. Specifically, in the IP Suit, the U.S. District Court already decided the issue of whether HHI had fulfilled its obligations under the employment agreement. In its opinion, the U.S. District Court stated that to obtain specific performance, a party must have "fully, not partially, performed." *HHI*, 404 F. Supp. 3d at 968. It then said that there were "no contentions" that HHI had failed to perform its obligations, and it granted HHI specific performance. *Id.* HHI thus argued in its motion to dismiss that the court had already ruled that HHI had fully performed the employment agreement. In the alternative, HHI argued that Mr. Shapiro's employment

16

counts had been compulsory counterclaims under Federal Rule of Civil Procedure 13 since the case was decided in federal court.

In response, Mr. Shapiro argued that the U.S. District Court had never explicitly ruled that HHI had fully performed its obligations under the employment agreement, and that such a ruling was not necessary to a grant of specific performance. Mr. Shapiro also argued that his employment counts did not amount to a compulsory counterclaim in the IP Suit because they did not arise out of the same transaction or occurrence as the intellectual property claim.

The circuit court held that Counts I and II were barred by collateral estoppel, and it dismissed those counts. It concluded that this issue was actually decided in the IP Suit and was material to the decision in the IP Suit—two requirements for collateral estoppel. It further explained that HHI "would not have been entitled to the remedy of specific performance if it had not fully performed with respect to the employment agreement." It also stated that "there was 'reason to think that the parties would have had their best chance [in the IP Suit] . . . to fight it out.'" (quoting *GAB Enters., Inc. v. Rocky Gorge Dev., LLC*, 221 Md. App. 171, 191 (2015)). Therefore, it dismissed both Counts I (the breach of contract claim) and II (the violation of Maryland wage law claim).[21]

---

[21] The court also dismissed Count IV, intrusion upon seclusion (unreasonable publicity given to private life), in this ruling; however, Mr. Shapiro does not challenge that ruling here.

## B. Summary Judgment on the Email Claims

HHI, along with its codefendants, then filed a motion for summary judgment[22] on the remaining counts in Mr. Shapiro's complaint. Regarding Mr. Shapiro's email counts, HHI argued that the laws Mr. Shapiro cited would require unauthorized access to his emails, and Mr. Shapiro granted HHI authority to view his emails by logging onto his personal email account on HHI computers and by virtue of the Employee Handbook. HHI explained that when Mr. Shapiro was employed at HHI, he asked Mr. Hughey to help him add his personal Gmail account to his work computers. Mr. Hughey said in an affidavit (offered into evidence by both HHI and Mr. Shapiro) that he mapped Mr. Shapiro's email account onto two HHI computers. Mr. Hughey explained that through this method, once Mr. Shapiro inputted his password the first time, Mr. Shapiro's Gmail account was downloaded to and stored on the configured computers.[23]

After Mr. Hughey helped Mr. Shapiro, HHI said that notifications about emails to Mr. Shapiro's personal account would pop up on the two HHI computers. These

---

[22] HHI filed two motions for summary judgment on the remaining counts. The circuit court denied its first motion without prejudice, partly to give Mr. Shapiro a chance to obtain further discovery on the remaining issues. We discuss here the second motion, as that judgment forms the basis for this appeal.

[23] The technology consultant, referred to *infra*, explained that because Gmail is cloud-based, typically when someone logs into their email on a computer, the emails are not stored or managed on that computer. Rather, the emails are stored and managed on a remote Gmail server, and the user needs an internet connection to access them. By mapping Mr. Shapiro's account onto the computers, as Mr. Hughey says he did, a list of the emails in the account's inbox would have been stored on the computers (in addition to the typical Gmail server) and could be readily downloaded to the computers upon clicking them.

18

notifications continued to pop up after Mr. Shapiro's termination. After employees complained about the notifications, Mr. Hughey deleted Mr. Shapiro's account from the server. Before doing so, he created a backup of the account by downloading it to a password-protected hard drive. He said he decided to create the backup in his capacity as IT Director because it was part of his standard operating procedure, and he knew HHI "was in some degree of difficulty with Mr. Shapiro . . . [and he] felt it was prudent to back up that information prior to deleting it in case it was needed later." HHI has not been able to find the hard drive containing Mr. Shapiro's emails.

HHI argued that Mr. Shapiro had not introduced any evidence that anyone at HHI unlawfully accessed and read his post-termination emails. It noted that Mr. Shapiro even testified during depositions that he could not identify a single email that anyone read. HHI argued that the only evidence of access was Mr. Hughey's access to delete the account mapping and create a backup; however, it contended that Mr. Hughey's access could not be unlawful because "[t]he argument by [Mr.] Shapiro that he could create the access and not permit [HHI] to remove that access without liability is sheer nonsense." Because Mr. Shapiro had not offered any evidence of unlawful access besides his own speculation, HHI argued the court should grant its motion for summary judgment.

HHI introduced affidavits of a technology consultant to support its assertion that its only access of Mr. Shapiro's personal email account was Mr. Hughey's access to download and delete it. The technology consultant examined Mr. Shapiro's email account and its activity after Mr. Shapiro was terminated. He found that Mr. Shapiro's email had

been accessed once following his termination, and he concluded that the access lined up with when Mr. Hughey deleted the account off the HHI computers. The technology consultant was not identified as an expert for either side, but, without objection from Mr. Shapiro, HHI offered the consultant's affidavits in support of its motion for summary judgment.

Moreover, HHI argued that pursuant to the Employee Handbook, employees had no reasonable expectation of privacy regarding any information or materials stored in HHI computers. Further, employees agreed that if they used HHI computers for personal purposes, they did so at their own risk. The handbook also stated,

> All computers, technology and communications systems, including e-mail, utilized at [HHI] are the property of [HHI]. Employees should not expect that their communications or messages would be kept private. Further [HHI] reserves the right to periodically review or inspect an employee's e-mails and files on the computer system as deemed necessary and appropriate and at its discretion.

HHI submitted a receipt of the Employee Handbook that contained Mr. Shapiro's signature acknowledging receipt.

In opposition, Mr. Shapiro argued that there was a genuine dispute of fact as to the method he used to access his personal emails. He disputed the process Mr. Hughey set forth; instead, he contended that the account was not stored on the HHI computers because he still had to input his password every time he opened his Gmail account. He also argued that there was a genuine dispute of fact as to whether anyone else at HHI read his emails. He contended that sometimes when he logged onto his account even after his termination, certain emails were marked read even though he had never read them.

20

However, Mr. Shapiro could not identify any specific emails he believed anyone had read. He also did not offer any other evidence that other people had accessed or read his emails.

Further, Mr. Shapiro claimed that he did not sign any acknowledgement of receipt of the handbook, and in fact, he never received an updated copy of the handbook upon his reemployment. Mr. Shapiro also argued that no employee handbook could have allowed HHI to access emails he had received after he was terminated and no longer an HHI employee. Additionally, he argued that Maryland requires both parties to a communication, such as an email, to consent to third-party access, and therefore, HHI could not have had prior consent to view his emails from non-HHI recipients[24] who had not consented.[25]

The circuit court granted defendants' motion for summary judgment. In issuing its oral opinion, the court explained that its principal focus was on whether there was any evidence that HHI "ever opened the files that were . . . downloaded from . . . [the] computers and held on[to] a hard drive that cannot now be located[.]" The court

---

[24] In other words, even assuming Mr. Shapiro had consented to the access, the people with whom he was emailing did not. For example, if Mr. Shapiro emailed his wife, HHI would need his wife's consent to view the email in addition to Mr. Shapiro's consent, and HHI could not have gotten Mr. Shapiro's wife's consent through the Handbook because she never agreed to the Handbook.

[25] Mr. Shapiro also argued summary judgment should be denied according to the doctrine of spoliation, because the defendants had failed to recover the hard drive onto which Mr. Hughey downloaded Mr. Shapiro's email account. We discuss Mr. Shapiro's spoliation argument in more detail *infra*, n.32.

continued that there was "no evidence that the Defendants ever reviewed or opened any of those files, a fundamental element in any of the claims in those several counts." Thus, the court found that there was no genuine dispute of material fact concerning the email claims, and it granted summary judgment in favor of HHI and the codefendants.

Mr. Shapiro timely appealed these judgments to this Court.

## Discussion

### I. Employment Agreement

#### A. Standard of Review

Regarding the circuit court's dismissal of Mr. Shapiro's employment counts, we review the granting of a motion to dismiss *de novo*; in other words, we determine whether the trial court was legally correct. *Grier v. Heidenberg*, 255 Md. App. 506, 520 (2022). For a trial court to grant a motion to dismiss, the complaint, on its face, must not have disclosed a legally sufficient cause of action. *Clark v. Prince George's County*, 211 Md. App. 548, 557 (2013). "[W]e look only to the allegations in the complaint and any exhibits incorporated in it[.]" *Worsham v. Ehrlich*, 181 Md. App. 711, 722 (2008) (quoting *Smith v. Danielczyk*, 400 Md. 98, 103-04 (2007)). We also "presume the truth of all well-pleaded facts in the complaint, along with any reasonable inferences derived therefrom." *Fioretti v. Md. State Bd. of Dental Exam'rs*, 351 Md. 66, 72 (1998). Furthermore, if we disagree with the reasoning relied upon by the circuit court, we may still "affirm the judgment of a trial court to grant a motion to dismiss on a different ground than that relied upon by the trial court, as long as the alternative ground is before

22

the Court properly on the record." *Med. Mgmt. & Rehab. Servs., Inc. v. Md. Dep't of Health & Mental Hygiene*, 225 Md. App. 352, 363 (2015) (quoting *Forster v. State Office of Pub. Defender*, 426 Md. 565, 580–81 (2012)).

### B. Analysis

We uphold the circuit court's dismissal of Mr. Shapiro's employment counts albeit on a different ground. The circuit court dismissed these counts based on collateral estoppel. We conclude that dismissal was appropriate because Mr. Shapiro should have brought these counts as counterclaims in the IP Suit, in compliance with Maryland's broad principles of res judicata. Because the employment counts and the IP Suit arose out of the same transaction, the employment counts were compulsory counterclaims in the IP Suit. Mr. Shapiro's failure to plead them there means he could not bring them in the circuit court.

Both collateral estoppel and res judicata are based on the "judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings[.]" *Colandrea v. Wilde Lake Community Ass'n*, 361 Md. 371, 391 (2000). Res judicata involves the same parties attempting to relitigate the same claim. *Id.* at 388 (quoting *Mackall v. Zayre Corp.*, 293 Md. 221, 228 (1982)). Under that doctrine, "a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action and is conclusive, not only as to all matters decided in the original suit, *but also as to matters that could have been litigated in the original suit*." *Id.* at 392 (omitting citations).

23

Unlike res judicata, "collateral estoppel is concerned with the issue implications of the earlier litigation of a different case . . . ." *Id.* at 390. Collateral estoppel will bar relitigation of a fact or issue if the fact or issue previously decided was "identical with the one presented" in the current action; there was "a final judgment on the merits" in the prior adjudication; if "the party against whom the plea [of collateral estoppel] is asserted" was a "party or in privity with a party to the prior adjudication[;]" and the "party against whom . . . [collateral estoppel] is asserted [was] given a fair opportunity to be heard on the issue" during the prior adjudication. *Id.* at 391.

Regarding the difference between res judicata and collateral estoppel, our Supreme Court has focused on claims versus facts or issues:

> If the second suit is between the same parties and is upon the *same cause of action,* a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which *were litigated* in the earlier case, but as to *all matters which could have been litigated* [res judicata]. If, in a second suit between the same parties, even though the *cause of action is different,* any determination of fact, which was *actually litigated* in the first case, is conclusive in the second case [collateral estoppel].

*Id.* at 388 (omitting citations).

To determine whether a new lawsuit concerns the same claim as a previous lawsuit, thus barring it under res judicata, Maryland courts typically apply the same evidence test, which asks whether the same evidentiary facts would sustain both lawsuits. *See MPC, Inc. v. Kenny*, 279 Md. 29, 33 (1977). However, because we hold a broad view of res judicata, there are other instances in which it applies. *See Rowland v. Harrison*, 320 Md. 223, 231 (1990) ("[W] 'the Maryland Rules of Procedure do not speak of

24

compulsory counterclaims, our broad definition of res judicata will, in many cases, have the same effect.'") (quoting *Higgins v. Barnes*, 310 Md. 532, 549 (1987)); Restatement (Second) of Judgments § 27, Reporter's Note (Am. L. Inst. 1982) ("Some of the decisions that might be regarded as inconsistent with this Comment . . . may be explained as involving special circumstances under which the failure to interpose a counterclaim operates as a bar. See § 22(2)[.]"). For example, if a party should have brought a counterclaim in the previous suit either because it would nullify the judgment or because the rules of the court in the previous suit required it, then res judicata will bar it in the subsequent suit. *See Rowland*, 320 Md. at 232 (adopting Restatement (Second) of Judgments § 22(2)(a) (Am. L. Inst. 1982)).

While Mr. Shapiro's employment counts are not barred by res judicata under the typical same evidence test, the exception for compulsory counterclaims does operate to bar his employment counts. The IP Suit concerned HHI's contentions that Mr. Shapiro was wrongfully using HHI's intellectual property. That case was litigated and concluded in the U.S. District Court. The evidence relevant to the IP Suit centered on Mr. Shapiro's purchase and use of HHI's intellectual property despite the existence of the employment agreement that prohibited him from doing so. Conversely, the employment counts would require different evidence. The relevant evidence to determine Mr. Shapiro's employment counts would center on facts about Mr. Shapiro's employment, the circumstances of his termination, and any payments HHI made to him following his termination. Although both the IP Suit and the employment counts arise from the employment agreement and its

25

interpretation, the material facts that would be required to prove Mr. Shapiro's employment counts are different from the material facts that were required to prove HHI's claims in the IP Suit.

However, the exception for counterclaims applies to Mr. Shapiro's employment counts. The Maryland Rules do not establish compulsory counterclaims,[26] but in *Rowland*, our Supreme Court adopted § 22 of the Second Restatement of Judgments, which establishes exceptions to that general rule. *See Rowland*, 320 Md. at 232. That section provides, in relevant part:

> (2) A defendant who may interpose a claim as a counterclaim in an action but fails to do so is precluded, after the rendition of judgment in that action, from maintaining an action on the claim if:
>
> > (a) The counterclaim is required to be interposed by a compulsory counterclaim statute or rule of court[.]

Restatement (Second) of Judgments § 22(2)(a) (Am. L. Inst. 1982).

---

[26] Our rule on counterclaims states:

> A party **may** assert as a counterclaim any claim that party has against any opposing party, whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim. A counterclaim may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party.

Md. Rule 2-331(a) (emphasis added).

Here, while Maryland does not require the filing of related counterclaims in its state courts except in limited circumstances,[27] we must look to federal law to determine whether Mr. Shapiro would have been required to file his employment counts as compulsory counterclaims in the IP Suit. In *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001), the Supreme Court of the United States discussed the appropriate application of federal rules in state courts. In that opinion, the U.S. Supreme Court emphasized that, in examining a federal court decision brought under federal question jurisdiction, a state court should determine any potential claim preclusion by reference to the federal rules that would have governed the case in federal court. Our Supreme Court has also explained that our state courts should apply federal rules in determining the res judicata effect of federal judgments. *See Kent Cnty. Bd. of Educ. v. Bilbrough*, 309 Md. 487, 493-94 (1987) (adopting § 87 of the Second Restatement of Judgments); Restatement (Second) of Judgments § 87 (1982) ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court."); *Anne Arundel Cnty. Bd. of Educ. v. Norville*, 390 Md. 93, 108 (2005) (applying § 87 of the Second Restatement of

---

[27] Maryland courts find a counterclaim to have been compulsory in a previous suit when it would nullify the judgment in the previous suit. Nullification in this sense only refers to direct and complete nullification but not to defenses that would have simply defeated the previous action. The court in *Rowland* explained, "It is one thing to say that a successful assertion of a defense of negligence would have defeated the debt action, and quite another to say that a successful prosecution of the malpractice action would nullify the enrolled judgment in the debt action." 320 Md. at 236 (giving examples of enjoining enforcement of a previous judgment or depriving the plaintiff in the first action of rights vested in him under the first judgment).

Judgments and explaining that "[i]f a final judgment exists as to a controversy between parties, those parties and their privies are barred from relitigating any claim upon which the judgment is based").

Here, the IP Suit was litigated in the U.S. District Court, a federal court. Additionally, it was based on federal question jurisdiction. Because it was litigated in federal court and based on federal question jurisdiction, we interpret the res judicata effect of its judgment using federal rules. In a civil case, federal courts use the Federal Rules of Civil Procedure ("FRCP"), so we look to those rules.

Under FRCP 13, certain counterclaims are compulsory:

> A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim:
>
> (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
>
> (B) does not require adding another party over whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a)(1). Thus, if, in federal court, a defendant has a defense whose factual underpinnings would also support a claim for relief and that arose out of the same transaction or occurrence as did the claim(s) against the defendant, then the defendant's claim for relief is a compulsory counterclaim.[28] *See id.* A defendant that fails to assert a compulsory counterclaim is barred from asserting that claim as a claim for relief in a

---

[28] That claim is a compulsory counterclaim provided that the party requirement is met. That requirement is met here because Mr. Shapiro would not have had to add another party in order to bring his employment counts.

28

subsequent proceeding. Fed. R. Civ. P. 13 advisory committee's note 7 to 1937 adoption

(citing *American Mills Co. v. American Surety Co.*, 260 U.S. 360 (1922)).

In the case before us, Mr. Shapiro's assertion that HHI did not fulfill its

contractual obligations under the employment agreement was a compulsory counterclaim

in the IP Suit. Under federal law, the determination of whether a counterclaim is

compulsory requires four separate inquiries:

> (1) Are the issues of fact and law raised in the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on the party's counterclaim, absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute the claim as well as the counterclaim? and (4) Is there any logical relationship between the claim and counterclaim?

*Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 452 (D. Md. 2014) (quoting *Painter v.*

*Harvey*, 863 F.2d 329, 331 (4th Cir. 1988)). The fulfillment of any of these inquiries will

render a counterclaim compulsory under federal law; there is no need to fulfill all of

them. *See id.*

Mr. Shapiro's employment counts were compulsory counterclaims in the IP Suit

because the employment counts and HHI's intellectual property counts arose from the

same transaction. Both Mr. Shapiro's and HHI's claims arose from Mr. Shapiro's

employment agreement and its interpretation. What's more, the issue of whether HHI

fulfilled its contractual obligations—the core of Mr. Shapiro's employment counts—was

a material consideration in the IP Suit. If Mr. Shapiro had raised and succeeded on his

employment counts during the IP Suit, the U.S. District Court would not have been able

to grant HHI specific performance. Under Maryland law, specific performance requires

29

that the party seeking performance "fully, not partially," perform its contractual obligations. *Clayten v. Proutt*, 227 Md. 198, 203 (1961); *Cattail Assocs., Inc. v. Sass*, 170 Md. App. 474, 499 (2006); *Suburban Garden Farm Homes Corp. v. Adams*, 171 Md. 212 (1937); *see also HHI*, 404 F. Supp. 3d at 968 (using this standard to determine that HHI was owed specific performance). Thus, if Mr. Shapiro had been able to establish that HHI had not fulfilled its obligations to him under the employment agreement, then the court could not have granted HHI specific performance, without HHI establishing that it was ready and willing to perform. *See Clayten*, 227 Md. at 203 ("There can be little doubt that one seeking the execution of a contract must, as a general rule, be able to show that he has fully, not partially, performed everything required to be done on his part, or, under some circumstances, that he is ready and desirous to comply with the contract on his part, and has the ability to perform it.").

Mr. Shapiro's employment counts thus arose from the same transaction—the employment agreement—as HHI's intellectual property claims, and there was a logical relationship among them, meaning they fulfill the compulsory counterclaim test set forth by federal courts. Because Mr. Shapiro's employment counts fulfill the compulsory counterclaim test, he should have brought them during the IP Suit and was barred from bringing them below. *See, e.g.*, *Tyler Marine Servs., Inc. v. Aqua Yacht Harbor Corp.*, 920 So. 2d 493, 495-97 (Miss. Ct. App. 2006) (applying FRCP 13 and holding that the plaintiff should have brought its claims as counterclaims in the previous federal lawsuit, even though the Mississippi rule would not have required bringing them as a

30

counterclaims in the previous federal lawsuit); *Paramount Pictures Corp. v. Allianz Risk Transfer AG*, 36 N.Y.S.3d 11 (2016), *aff'd*, 96 N.E.3d 737 (2018) (holding that state courts should apply FRCP 13 to determine whether a state plaintiff should have brought their causes of action as compulsory counterclaims in a previous federal action and that the plaintiff's state claims were compulsory counterclaims, even though New York's permissive counterclaim rule would not have barred them under res judicata); *Birdsong v. Enforcer Prod., Inc.*, 508 S.E.2d 769, 770-71 (Ga. 1998) (holding that there was a logical relationship between plaintiff's state causes of action and defendant's previous federal court causes of action, meaning plaintiff was required under FRCP 13 to raise his claims as counterclaims in the previous action); *cf. Balbir Brar Assocs., Inc. v. Consol. Trading & Servs. Corp.*, 477 S.E.2d 743, 745-46 (Va. 1996) (applying FRCP 13 to determine whether the plaintiff should have brought his state causes of action as compulsory counterclaims in the previous federal court action but finding that the causes of action did not qualify as compulsory counterclaims under the rule).

The fact that Mr. Shapiro's employment counts failed the same evidence test does not negate our conclusion. While some of *Welch & Rushe, Inc.*'s compulsory counterclaim inquiries appear similar to the same evidence test, the U.S. District Court for the District of Maryland has clarified that there are substantial differences between the two tests:

> Where the same evidence will support or refute both the claim and counterclaim, the counterclaim will almost always be compulsory. This "same evidence" test, however, is **not the exclusive determinant** of compulsoriness under Rule 13(a) because it is **too narrow** a definition of a

31

single transaction or occurrence. A counterclaim may arise from the same "transaction or occurrence," and thus be compulsory under Rule 13(a), even though the evidence needed to prove the opposing claims may be quite different.

*Welch & Rushe, Inc.*, 28 F. Supp. 3d at 452 (cleaned up) (emphasis added). Therefore, it is of no consequence here that the evidence required to prove Mr. Shapiro's employment counts is different from the evidence that was required to prove HHI's intellectual property counts in the IP Suit.

Accordingly, because Mr. Shapiro should have brought his employment counts in the IP Suit under the federal rules for compulsory counterclaims, those employment counts are barred here under res judicata. We thus affirm the circuit court's dismissal of those claims, albeit on different grounds.

## II.    Emails

### A.  Standard of Review

We next review HHI's grant of summary judgment on Mr. Shapiro's claim that HHI wrongfully accessed emails he received on his personal email account after he was terminated.[29] We review the grant of a motion for summary judgment *de novo*. *Webb v. Giant of Md., LLC*, 477 Md. 121, 135 (2021). In other words, we determine whether the trial court was legally correct. *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694

---

[29] Count IV, invasion of privacy (unreasonable publicity given to private life) was dismissed on HHI's motion to dismiss. The court then granted HHI's motion for summary judgment on Count III, invasion of privacy (intrusion upon seclusion); Count V, violation of the Stored Electronic Communications Act; and Count VI, violation of the Maryland Wiretapping and Electronic Surveillance Act. Mr. Shapiro only appeals the grant of summary judgment on Counts III, V, and VI.

(2015). Under Maryland Rule 2-501, "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f).

To determine whether HHI should have been granted summary judgment on Mr. Shapiro's email counts then, we first examine whether there was a genuine dispute of material fact. In doing so, we "conduct an independent review of the record[,]" *Md. Cas. Co.*, 442 Md. at 694, "in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party[,]" *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 67 (2006). Rather than attempting to retry the case or resolve factual disputes, the function of summary judgment is to "determine whether there is a dispute as to material facts sufficient to provide an issue to be tried." *Id.* "A 'material fact' is one which will somehow affect the outcome of the case." *Id.* If the "moving party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to a material fact." *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md. App. 236, 243 (1992) (internal quotations omitted). The nonmoving party cannot defeat a motion for summary judgment based solely on speculation about unproduced evidence. *See Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 488-89 (1995).

Therefore, we will reverse a grant of summary judgment when there is a dispute of fact that is genuine and affects the outcome of the case. After a determination that there is

33

no genuine dispute of material fact, we only reverse a grant of summary judgment that is based on an incorrect interpretation of the law. *See Dashiell v. Meeks*, 396 Md. 149, 163 (2006) ("Only when there is an absence of a genuine dispute of material fact will the appellate court determine whether the trial court was correct as a matter of law.").

### B. Analysis

Beginning with the undisputed facts, Mr. Shapiro admitted in his pleadings that when he was employed at HHI, he used HHI computers to check his personal email account. At the relevant time, under the 2016 HHI Employee Handbook, employees agreed that they had no expectation of privacy in their work computers, and HHI retained the right to review and inspect employee computers and emails. Mr. Hughey helped Mr. Shapiro set up his personal email account on the HHI computers—although precisely how he did this is disputed. When Mr. Shapiro was terminated, both parties agree that his email notifications continued to appear on the HHI computers. To remedy this problem, Mr. Hughey deleted Mr. Shapiro's personal email account from the computers, but before doing so, he made a backup on a hard drive. He said that he did this as standard operating procedure and because he knew HHI was in some litigation with Mr. Shapiro so he thought it would be prudent. HHI said that it could not find this hard drive. Mr. Shapiro only contests alleged post-termination access of his emails; he does not contest any accessing of his emails that may have occurred during his employment.[30]

---

[30] Mr. Shapiro also acknowledged in his complaint that he was suing each of the individual defendants in their official capacity as employees of HHI. He said,

In opposition to HHI's motion for summary judgment, Mr. Shapiro argued that some material facts are disputed such that summary judgment for HHI was inappropriate. First, Mr. Shapiro asserts that there is a dispute about whether any HHI employees read Mr. Shapiro's emails after his termination. Mr. Shapiro contends that other employees did read his post-termination emails before Mr. Hughey deleted the account from the HHI computers. He also contends that HHI employees read his emails using the backup Mr. Hughey made. However, he does not offer evidence to support these contentions. Instead, he urges that HHI's employee witnesses are not credible and had motivations to lie about whether they viewed his emails.

Next, regarding damages, in his complaint, Mr. Shapiro alleged harm in the form of embarrassment. However, HHI disputes that Mr. Shapiro suffered embarrassment because Mr. Shapiro does not offer any evidence for his embarrassment other than his speculation that his emails were read. HHI argued in its motion for summary judgment that because Mr. Shapiro has not suffered embarrassment, he cannot fulfill the statutory requirements for damages.[31]

---

> Unless proven otherwise, the non-business entity Defendants individually named in this suit committed the acts and omissions complained of herein in their respective capacities as agent, servants, or employees of the business entity Defendants and within the scope of their respective agency or employment, and/or they acted at the direction of their superiors.

[31] Mr. Shapiro also argues that it remains disputed among the parties whether he was on notice of the employee handbook. HHI contends that his signature on the receipt of the employee handbook proves that he was on notice of its policies. Therefore, it also

None of these points move the summary judgment needle toward Mr. Shapiro, however. Beginning with whether anyone at HHI read Mr. Shapiro's emails, there is no genuine dispute regarding this fact. HHI has produced sworn statements from each of the individual defendants that none of them ever opened, looked at, or read Mr. Shapiro's emails. Mr. Shapiro offers no evidence to the contrary. During a deposition, HHI asked Mr. Shapiro, "I'm trying to find out whether you can identify whether anybody has used any of that information that was contained in those e-mails?" Mr. Shapiro responded, "**I don't have any facts. I can only speculate.**" (Emphasis added). During the deposition, Mr. Shapiro based his speculation on assumptions about what he believed HHI employees would do, saying, "I think it's safe to say that human nature would have had those individuals reading it." But Mr. Shapiro's speculation does not create a material dispute of fact as to whether HHI employees accessed his email, other than Mr. Hughey's access. *Bagwell*, 106 Md. App. at 489 (explaining that "speculation concerning the existence of unproduced evidence [does not] defeat the motion").[32] Therefore, it is

---

contends that Mr. Shapiro was bound by its policies and that, according to the handbook's policies, HHI had the right to access any of Mr. Shapiro's emails (including emails he received after he was terminated) once he logged onto his account on the HHI computers. Mr. Shapiro disputes that he was on notice of the handbook in the first place; he argues that he never received the updated version of the handbook and that he did not sign the receipt HHI presented. He also contends that this disputed fact is material because if he was not on notice of the handbook policies, he could not be bound by them.

However, while these facts may be disputed, they are not material to the resolution of Mr. Shapiro's email counts.

[32] Mr. Shapiro also attempts to argue that the doctrine of spoliation applies. He says that under that doctrine, "a party should not be allowed to support its claims or

undisputed that HHI did not access Mr. Shapiro's post-termination emails, besides when Mr. Hughey downloaded and deleted the account.

Having determined that there was no genuine dispute concerning whether anyone at HHI *read* Mr. Shapiro's emails (they didn't), we next apply the law. Regarding his post-termination emails, Mr. Shapiro alleged three counts: one count of invasion of privacy (intrusion upon seclusion), one count of a violation of Maryland's Stored Electronic Communications Act, *see* Md. Code, CJP §§ 10-4A-01 & 10-4A-08, and one count of a violation of the Wiretap Act, *see* Md. Code, CJP §§ 10-401, 10-402, & 10-410. The resolution of the dispute over whether other HHI employees viewed Mr. Shapiro's email necessarily disposes of his intrusion upon seclusion claim and his Wiretapping and Electronic Surveillance Act claim. However, the undisputed fact that Mr. Hughey downloaded Mr. Shapiro's email account precludes summary judgment in favor of HHI on Mr. Shapiro's SECA count as a matter of law.

With regard to Mr. Shapiro's first email count, intrusion upon seclusion, the circuit court was correct to grant summary judgment to HHI because, without anyone at HHI having read Mr. Shapiro's emails, there was no intrusion, let alone offensive

---

defenses with physical evidence that it has destroyed to the detriment of its opponent." *Cumberland Ins. Grp. v. Delmarva Power*, 226 Md. App. 691, 696-97 (2016). Although we are not sure what production of the hard drive would prove, since Mr. Hughey already admitted to creating it, Mr. Shapiro has failed to prove an act of destruction or intent to destroy it, both required elements for spoliation. *See Klupt v. Krongard*, 126 Md. App. 179, 199 (1999). Furthermore, even a favorable finding of spoliation, that HHI destroyed the hard drive with the emails, cannot defeat the fact that Mr. Shapiro has produced no evidence that anyone *read* the emails.

37

intrusion, into Mr. Shapiro's privacy. Intrusion upon seclusion is "[t]he intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." *Furman v. Sheppard*, 130 Md. App. 67, 73 (2000) (citing, among others, Restatement (Second) of Torts, § 652B (Am. L. Inst. 1977)). Thus, intrusion upon seclusion requires an intentional intrusion upon private affairs that would be highly offensive to a reasonable person. *See Harleysville Preferred Ins. v. Rams Head Savage Mill, LLC*, 237 Md. App. 705, 725 (2018) ("[W]hether conduct is 'highly offensive' is based on a test of reasonableness."); *Lazette v. Kulmatycki*, 949 F. Supp. 2d 748, 761 (N.D. Ohio 2013) (finding that an employer "*reading*" an employee's emails, "if proven to have occurred, [could be] 'highly offensive'" (emphasis added)).

Whether Mr. Shapiro's emails were on HHI's computers, or downloaded onto a hard drive, there was no evidence that anyone from HHI read the emails. Simply possessing the emails on the HHI computers does not mean that HHI's employees intruded upon them. Nor does downloading the emails onto a hard drive. Indeed, Mr. Shapiro has offered no evidence that anybody opened (and thus intruded upon) a single email from HHI's computers or the hard drive. Further, without identifying any emails that anybody read, Mr. Shapiro cannot prove that any alleged intrusion would be highly offensive to a reasonable person.

The circuit court was correct to grant summary judgment to HHI on Mr. Shapiro's second email count, as well. In his second count, Mr. Shapiro alleged a violation of the Wiretap Act. Section 10-402 of the Wiretap Act provides:

Except as otherwise specifically provided in this subtitle it is unlawful for any person to:

> (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

> (2) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or

> (3) Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle.

Md. Code, CJP § 10-402.

Fundamental to a violation of the Wiretap Act is that a communication have been (or endeavor to have been) intercepted. "Intercept" is defined by the Wiretap Act as "the aural or other acquisition of the contents" of an electronic communication. CJP § 10-401(10). Interception requires "acquisition contemporaneous with transmission" of the communication. *Martin v. State*, 218 Md. App. 1, 19 (2014). "That is to say, an 'intercept' does not occur when . . . the electronic communication was in storage at the time of acquisition." *Id.*

Summary judgment was appropriate on Mr. Shapiro's Wiretap Act count because there was no evidence that anyone at HHI "intercepted" his post-termination emails. To the extent that Mr. Shapiro claims that those at HHI read his post-termination emails, there is no evidence that they did so, let alone that they did so while the emails were

being sent. Without such evidence, Mr. Shapiro cannot claim that anyone at HHI acquired, or endeavored to acquire, the contents of his emails as they were being transmitted, or disclosed or used the contents of his emails knowing that they had been intercepted. Regarding the backup of Mr. Shapiro's post-termination emails that Mr. Hughey downloaded, Mr. Shapiro offers no evidence that Mr. Hughey did so while the emails were being sent, i.e., contemporaneously with their transmission, or that he did so by accessing other than stored emails. Accordingly, Mr. Shapiro presents no evidence that Mr. Hughey's conduct amounts to an "interception" under the Wiretap Act.

The circuit court was incorrect, however, in granting HHI summary judgment on Mr. Shapiro's third email count because a violation of the law at issue does not require HHI to have read Mr. Shapiro's emails. Instead, the statute targets unauthorized access to an email server, which is what Mr. Shapiro alleges Mr. Hughey did by downloading Mr. Shapiro's emails onto a hard drive. For this last email count, Mr. Shapiro alleged a violation of Maryland's Stored Electronic Communications Act, Md. Code, CJP §§ 10-4A-02 *et seq*. Section 10-4A-02 of this Act provides,

> Except as provided in subsection (c) of this section, a person may not obtain, alter, or prevent authorized access to a wire or electronic communication while it is in electronic storage in an electronic communications system by:
>
> (1) Intentionally accessing without authorization a facility through which an electronic communication service is provided; or
>
> (2) Intentionally exceeding an authorization to access a facility through which an electronic communication service is provided.

40

Section 10-4A-08 of the Act establishes a cause of action for "subscribers" or "customers," among others: "[e]xcept as provided in § 10-4A-04(d)[33] of this subtitle, a . . . subscriber, or customer aggrieved by a knowing or intentional violation of this subtitle may recover appropriate relief in a civil action against the person or entity that engaged in the violation." (Footnote added).

In granting summary judgment for HHI on this count, the circuit court concluded that because there was no genuine dispute of material fact regarding whether anyone at HHI read Mr. Shapiro's post-termination emails, Mr. Shapiro could not recover under the Act as a matter of law. In doing so, the circuit court concluded that a violation of the SECA requires that the defendants have read the plaintiff's emails.

We disagree. The Act does not require that HHI have read Mr. Shapiro's post-termination emails. Instead, it requires that HHI "obtain, alter, or prevent authorized access" by "intentionally accessing without authorization" or "exceeding authorization to access a facility through which an electronic communication service is provided." Thus, while the court was correct in concluding that Mr. Hughey's deletion of the account did not qualify as obtaining, altering, or preventing authorized access, it was wrong to conclude that Mr. Hughey's download of the account onto the hard drive did not qualify as altering or obtaining authorized access.

---

[33] Section 10-4A-04(d) provides, "Nothing in this subtitle may be construed as creating a cause of action against any provider of wire or electronic communication service, its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with the terms of a court order, warrant, subpoena, or certification under this subtitle."

41

First, the court was correct in concluding that Mr. Hughey's deletion of Mr. Shapiro's email account from the HHI's computers did not meet the access requirements of the Act. There is no dispute that Mr. Shapiro's account was already accessible on the HHI computers because all parties agree that email notifications were popping up on the HHI computers. HHI has also shown that there is no dispute that Mr. Hughey accessed Mr. Shapiro's account simply to delete it from the HHI computers. Further, there is no dispute regarding whether—other than downloading it, which we discuss *infra*—Mr. Hughey did anything other than delete the account. By going onto the HHI computers simply to delete Mr. Shapiro's account, Mr. Hughey did not obtain, alter, or prevent authorized access as a matter of law. HHI sufficiently demonstrated that the access to Mr. Shapiro's Gmail account was already present on its computers because Mr. Shapiro logged in, and Mr. Hughey acted to delete the access. Regardless of whether Mr. Hughey mapped Mr. Shapiro's emails onto the computers at Mr. Shapiro's request or Mr. Shapiro logged into his emails every time,[34] Mr. Shapiro consented to the initial access.[35] That

---

[34] IMAP, which is the protocol Mr. Hughey claims he used, would have stored Mr. Shapiro's emails on an HHI server, in addition to the Gmail server on which they are normally stored. When emails are mapped onto another server using the IMAP protocol, the user can view and edit their emails even when they are not connected to the internet. Conversely, if Mr. Shapiro had just logged in and out each time he viewed his email, his emails would have only been stored on the Gmail server and not the HHI server. *See Enable Your Gmail Account for IMAP in Exchange Online*, Microsoft Learn (Feb. 21, 2023), https://learn.microsoft.com/en-us/exchange/mailbox-migration/enable-gmail-accounts-for-imap.

[35] Mr. Shapiro has repeatedly raised as a defense that Maryland is a two-party consent state to counter HHI's contention that he consented to the initial access by

42

access continued while the notifications were popping up on the HHI computers after Mr. Shapiro's termination. Then, Mr. Hughey ended the access by deleting the email account from the computer. HHI established in their motion for summary judgment that to do so, Mr. Hughey did not obtain new access or increase existing access. Mr. Shapiro presented no evidence to the contrary. Therefore, the court was correct in concluding that Mr. Hughey's access to delete the account from the HHI computers was not a wrongful access under the statute as a matter of law.

The court was incorrect, however, when, in granting summary judgment to HHI, it concluded that Mr. Hughey's download of Mr. Shapiro's email could not, as a matter of law, have met the unauthorized access requirements of the Act. Rather, for a violation, the SECA requires that the defendant "obtain, alter, or prevent" access to "a facility through which an electronic communication service is provided[.]" A violation may occur either by accessing the facility without authorization or by exceeding existing authorization. *See* Md. Code, CJP § 10-4A-02. While Mr. Shapiro may have authorized HHI's access to his Gmail account by logging onto it, Mr. Hughey's downloading the entirety of Mr. Shapiro's email account onto a hard drive, i.e., a new device that HHI could access (and that Mr. Hughey thought it prudent to retain), amounted to access that

_____

logging in himself. *See* Md. Code, CJP § 10-402(c)(3) ("It is lawful under this subtitle for a person to intercept a wire, oral, or electronic communication where the person is a party to the communication and where all of the parties to the communication have given prior consent[.]"). However, that Maryland is a two-party consent state does not matter because Mr. Shapiro has offered no evidence that anyone read the emails. Thus, there are no parties besides Mr. Shapiro who would have needed to consent to the access because none of his conversations were accessed.

43

exceeded Mr. Shapiro's authorization.[36] Therefore, HHI was not entitled to summary

judgment on the final email count because the circuit court was incorrect in concluding

that a download of Mr. Shapiro's email account would not meet the Act's access

requirements as a matter of law.

Alternatively,[37] HHI also contends that it should have been granted summary

judgment because Mr. Shapiro did not offer any evidence of damages. However, Mr.

---

[36] Under the SECA, Mr. Shapiro is a "customer" or "subscriber" of Gmail by virtue of his personal email account with Gmail, so he qualifies as someone who may bring a civil action under Maryland Code, CJP § 10-4A-08.

Moreover, Mr. Shapiro's Gmail account qualifies as a "facility" under the statute because an electronic communication service is provided through Gmail. *See* Md. Code, CJP § 10-4A-02; *Lazette*, 949 F. Supp. 2d at 756 (finding that the server on which the emails reside—in that case the Gmail server—was a "facility" under the analogous federal Act (the Stored Communications Act, 18 U.S.C. § 2701(a)(1)) while the cell phone that accessed the emails was not); *cf. Martin v. State*, 218 Md. App. 1, 20 (2014) (holding that a cell phone itself was not a "facility" under the statute but a cell tower, its transmitters, and servers and switches would be). The technology consultant's affidavit also supports the conclusion that Gmail is a "facility." According to the technology consultant, Gmail is a server where emails are stored, managed, and controlled, in line with the definition provided in *Lazette* for a facility under the analogous federal Act. *See* 949 F. Supp. 2d at 756.

[37] Regarding HHI's alternative argument concerning the Employee Handbook, that Mr. Shapiro may have known about, and consented to, the Employee Handbook's "no privacy" notice does not entitle HHI to summary judgment on Mr. Shapiro's post-termination emails concerning his final emails count. Regardless of whether he was on notice of it, the Employee Handbook could not apply to emails Mr. Shapiro received after he was terminated, which were the only ones Mr. Shapiro contested. Mr. Shapiro's employment agreement explicitly stated that it would terminate if HHI terminated Mr. Shapiro: "Unless otherwise determined by the [HHI] in its sole discretion, this agreement, and your employment by [HHI], shall automatically terminate upon any of the following to occur: . . . [HHI] determines in its sole discretion that you have engaged in unprofessional, unethical or fraudulent conduct[.]" Further, the Employee Handbook

44

Shapiro did not have to offer evidence on damages. The Stored Electronic

Communications Act does not require evidence of damages for a successful claim. *See*

Md. Code, CJP § 10-4A-02. That statute only requires that Mr. Shapiro prove HHI

obtained, altered, or prevented authorized access to his emails by intentionally accessing

them without authorization or by intentionally exceeding its authorization to access them.

*Id.* The statute then provides that Mr. Shapiro may recover "appropriate relief[,]" in the

form of equitable or declaratory relief, actual damages, or reasonable attorney's fees. Md.

Code, CJP § 10-4A-08. Thus, Mr. Shapiro's lack of actual damages evidence is not a

ground for summary judgment against him because, even if he cannot prove actual

damages, Mr. Shapiro may still receive equitable or declaratory relief or reasonable

attorney's fees.[38]

## INDEMNIFICATION SUIT

### Procedural Background

---

explicitly only applied to "employees" of HHI: "The information contained in this handbook applies to all employees of [HHI]." HHI has not identified any provision of the employment agreement that would suggest the Handbook's "no privacy" notice survives an employee's termination. When HHI terminated Mr. Shapiro, Mr. Shapiro was no longer an employee, and HHI lost any right it may have had to view his future emails. *See Adler v. Am. Standard Corp.*, 291 Md. 31, 35 (1981) ("The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time."). Accordingly, to the extent that the circuit court's summary judgment decision rested on HHI's Employee Handbook, that decision was in error.

[38] In his complaint, Mr. Shapiro requested "for all available forms of monetary damages . . . [including] reasonable attorney's fees, expert witness fees, and costs; [and] that an Order be entered by the Court compelling Defendants to cease and desist from engaging in such unlawful practices in the future[.]"

45

## I.  HHI's Fraud Suit Against Mr. Shapiro

We begin as litigation among the parties did, with HHI's Fraud Suit against Mr. Shapiro. The Fraud Suit was the underlying case for which Mr. Shapiro sought reimbursement in his Indemnification Suit against HHI. It is the Indemnification Suit that is on appeal before us. Nonetheless, Maryland's corporate indemnification statute requires that we examine the allegations and verdict in the underlying suit.

HHI initiated the Fraud Suit to attempt to hold Mr. Shapiro liable for its Tricare repayments and its Qui Tam Suit settlement. HHI alleged that Mr. Shapiro had committed intentional misrepresentation by intentionally and improperly prescribing and supervising HBOT treatments when he was not a licensed physician. HHI further alleged that Mr. Shapiro induced HHI to rely, and HHI justifiably did rely, on his actions "because he was a shareholder, director, and owed fiduciary duties to Hyperheal." Moreover, HHI alleged that Mr. Shapiro's actions in prescribing the HBOT treatment were "in contravention of his fiduciary duties to" HHI. It claimed that Mr. Shapiro received an improper benefit from this scheme as a majority shareholder and because he was using the company bank account as his personal account during that time. HHI also claimed that Mr. Shapiro was able to carry out this scheme because "[a]s a shareholder and director that controlled the day-to-day operation of" HHI, he knew how the billing process worked and supervised the transmission of the fraudulent claims to Tricare.

Additionally, HHI claimed that Mr. Shapiro was liable to indemnify HHI for its two repayments to Tricare and eventually its settlement agreement in the Qui Tam Suit. It

stated that its losses (by virtue of these payments) were a direct result of Mr. Shapiro's actions. It said, "[u]nder implied indemnity in fact, no legal or factual dispute exists that Shapiro owed a fiduciary duty to [HHI] as its majority owner, an officer, director, in control of day-to-day operations and an employee."

The Fraud Suit ultimately went to a six-day jury trial. At the end of trial, the court gave jury instructions on non-disclosure or concealment, the fiduciary duty an officer and director owe to a corporation, and indemnity, among other instructions. The jury found Mr. Shapiro not liable to HHI for fraud and not obligated to indemnify HHI.[39] Thus, the verdict entirely favored Mr. Shapiro.

## II.    Mr. Shapiro's Indemnification Suit Against HHI

Following his victory in the Fraud Suit, Mr. Shapiro sought indemnification from HHI for the expenses he had incurred in defending HHI's suit. HHI denied Mr. Shapiro's claim. Mr. Shapiro then filed the Indemnification Suit in the Circuit Court for Baltimore County, claiming that by denying his indemnification request, HHI had violated Maryland corporate law and its own corporate articles. Maryland corporate law provides for "permissible" and mandatory indemnification under circumstances we are about to discuss. HHI's Articles of Amendment and Restatement, specifically the Eighth Article, provide for indemnification as well:

---

[39] The case also concerned two counts against Ms. Schrum and her company, MBC. All counts against Ms. Schrum were dismissed with prejudice on the last day of trial. The court instructed the jury to render a verdict concerning MBC only if it found Mr. Shapiro liable for fraud. It found Mr. Shapiro not liable.

The Corporation shall indemnify and advance expenses to all of its present and former directors and officers in connection with any proceeding (as such term is defined in Section 2-418 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended from time to time) to the fullest extent permitted by and in accordance with the laws of the State of Maryland.

In Mr. Shapiro's Indemnification Suit, both parties sought summary judgment.[40] After a hearing on the motions, the court issued an opinion and granted summary judgment in favor of HHI. It analyzed C&A § 2-418 and held that, for Mr. Shapiro to recover, HHI must have sued Mr. Shapiro in the Fraud Suit as a director or officer, but HHI had not done so, so Mr. Shapiro could not recover. The court concluded,

> In this case, although Mr. Shapiro was an officer and director at the time the fraudulent billing is alleged to have taken place, his conduct was that of an HBOT certified technician. He was not required to be an officer or director to submit the bills to Tricare. No "corporate powers were used or necessary for the commission of the alleged misconduct." As with the trustee in Kramer, Mr. Shapiro's conduct may also have been a breach of the fiduciary duties he owed as a director but his conduct was not undertaken as a director or officer and was not the factual basis on which he was sued.

> The court finds that there [*sic*] no genuine dispute of material fact that the Plaintiff's status or conduct as a corporate officer or director was not the basis of the claims asserted against him in the [Fraud Suit].

Thus, the court concluded that HHI only sued Mr. Shapiro as an employee, and so he was not entitled to indemnification as a director or officer. The court also held that while it remained HHI's burden to prove any defenses, under C&A § 2-418, the jury verdict alone

---

[40] The court denied the parties' first motions for summary judgment. We focus on their second motions for summary judgment, as set forth below, because the court's grant of HHI's second motion for summary judgment is the one on appeal before us.

did not disprove Mr. Shapiro's having acted in bad faith or having received an improper financial benefit.

Mr. Shapiro timely noted his appeal from the Indemnification Suit to this Court.

## Discussion

### I. Indemnification

#### A. Standard of Review

As above, we review a trial court's grant of summary judgment *de novo*. *Webb*, 477 Md. at 135. Pursuant to Maryland Rule 2-501, a trial court may grant a party's motion for summary judgment when "there is no genuine dispute as to any material fact and that party is entitled to judgment as a matter of law." Since the circuit court granted HHI's motion for summary judgment, we review that grant *de novo* to determine whether there was a genuine dispute of material fact before the court. Since this case concerns indemnification, we view HHI's allegations, rather than any findings of fact, to determine whether HHI's motion should have been granted. *See Max's of Camden Yards v. A.C. Beverage*, 172 Md. App. 139, 151-56 (2006) (holding that a court should examine the allegations in the underlying pleadings, instead of findings of fact); *see also Marino v. Patriot Rail Co.*, 131 A.3d 325, 346 (Del. Ch. 2016) (same). However, we look beyond the corners of HHI's complaint to its arguments throughout the Fraud Suit because that case has concluded. *See Branin v. Stein Roe Inv. Couns., LLC*, No. CIV. A. 8481-VCN, 2014 WL 2961084 (Del. Ch. June 30, 2014) (concluding the court may look beyond the pleadings because it looks at substance as well as form); *Pike Creek Chiropractic Ctr.,*

49

*P.A. v. Robinson*, 637 A.2d 418, 422 (Del. 1994) (looking beyond the complaint because the merits of the underlying case had already been decided); *cf. Premcor Ref. Grp., Inc. v. Matrix Serv. Indus. Contractors, Inc.*, No. CIVA 07C-01095JOH, 2009 WL 960567 (Del. Super. Ct. Mar. 19, 2009) (holding that while there are times where it is proper to look beyond the complaint, the case at issue did not present one of those times because one of the underlying complaints was still pending).

Moreover, "[t]he interpretation of a statute is a question of law that this Court reviews *de novo*." *Johnson v. State*, 467 Md. 362, 371 (2020). Because the arguments in the Indemnification Suit center around C&A § 2-418 and our interpretation of it, that analysis must be *de novo* as well. Further, in interpreting a statute, our "chief objective is to ascertain the General Assembly's purpose and intent when it enacted the statute." *Berry v. Queen*, 469 Md. 674, 687 (2020). We focus "primarily on the language of the statute" and "begin our analysis by first looking to the normal, plain meaning of the language of the statute," *id.* (quoting *Brown v. State*, 454 Md. 546, 550-51 (2017)), because the "best source of legislative intent is the statute's plain language," *Kramer v. Liberty Prop. Tr.*, 408 Md. 1, 19 (2009). When the statute's plain language is "clear and unambiguous, our inquiry ordinarily ends there." *Kramer*, 408 Md. at 19.

However, we also view the plain language "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *State v. Johnson*, 415 Md. 413, 421 (2010). Additionally, "[w]hile not necessary in every instance, we often find it prudent to scrutinize the legislative

50

history to confirm that our interpretation of the statute's plain language accords with the legislature's intent." *Berry*, 469 Md. at 687-88; *see also Kramer*, 408 Md. at 19 ("In the interest of completeness, however, we may look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." (internal quotations omitted)).

Finally, our Supreme Court has previously provided guidance on the framework for interpreting C&A § 2-418. According to the Supreme Court, because Delaware's indemnification statute is similar to ours and because of Delaware's extensive expertise in corporate law, Delaware law may provide persuasive authority for interpreting C&A § 2-418. *Id.* at 24-25 ("Due to this similarity [between our statute and Delaware's statute], and because the Delaware courts have gained a reputation for their expertise in matters of corporate law, we deem decisions of the Delaware Supreme Court and Court of Chancery to be highly persuasive as to our interpretation . . . of § 2-418."). Accordingly, we keep these authorities in mind when interpreting the statute and analyzing the case before us.[41]

## B. Parties' Contentions

Mr. Shapiro's primary claim in the Indemnification Suit was that HHI was required to indemnify him under its corporate charter and C&A § 2-418 for his successful

---

[41] Additionally, the Supreme Court said in *Kramer* that § 2-418 was modeled after the corresponding provision in the Model Business Corporation Act ("MBCA"). *Kramer*, 408 Md. at 22. Therefore, the MBCA provides persuasive authority for interpreting C&A § 2-418. *Id.*

defense of the Fraud Suit. He now claims on appeal that the circuit court was incorrect in granting HHI's motion for summary judgment and asks that we reverse that grant of summary judgment. Conversely, HHI requests that we uphold the circuit court's grant of summary judgment in HHI's favor.

Mr. Shapiro argues that since he is requesting indemnification under C&A § 2-418's mandatory indemnification provision, he need not have been sued by reason of his service as an officer or director. Thus, he argues that he could have been sued in his capacity as an employee. Alternatively, Mr. Shapiro argues that if recovery under Maryland law requires he be sued by reason of his service as an officer or director, the law only requires a minimal nexus between his service and the underlying proceeding. Finally, argues Mr. Shapiro, even if C&A § 2-418 requires more than a minimal nexus, the Fraud Suit was sufficiently causally connected to his service as a director and officer to meet the requirement for indemnification.

HHI argues the circuit court was correct in granting it summary judgment because to recover under Maryland law, Mr. Shapiro must have been sued by reason of his service as an officer or director, and there must have been more than a minimal nexus between his service to HHI and the Fraud Suit. HHI argues that it did not sue Mr. Shapiro in the Fraud Suit by reason of Mr. Shapiro's service in his capacity as an officer or director. Instead, HHI brought the Fraud Suit against Mr. Shapiro as an employee. Therefore, it argues that Mr. Shapiro could not recover indemnification as a matter of law.

In the alternative, if we conclude that HHI sued Mr. Shapiro as an officer or director as a matter of law, HHI argues that Mr. Shapiro acted in bad faith and with active and deliberate dishonesty and that he received an improper personal benefit, all of which would preclude indemnification. Mr. Shapiro responds that the prohibition against bad faith and an improper personal benefit does not apply to this case as a matter of law because a jury ruled in his favor. If the prohibition against bad faith and an improper personal benefit does apply, Mr. Shapiro argues that there is at least a genuine dispute of material fact that he did not act in bad faith or receive an improper personal benefit.

## C. Analysis

We reverse the circuit court's grant of summary judgment in HHI's favor. Mr. Shapiro was sued in the Fraud Suit in his capacity as an HHI director and officer. HHI alleged that it relied on Mr. Shapiro's representations; that its reliance was reasonable because, as a director and officer, Mr. Shapiro owed HHI fiduciary duties; and that it was Mr. Shapiro's breach of these fiduciary duties that caused HHI's losses. To be sure, HHI also sued Mr. Shapiro in his capacity as an HHI employee, a capacity for which Mr. Shapiro is not entitled to indemnification. But the allegation of two capacities, one indemnified and one not, does not change the fact that Mr. Shapiro was sued in his capacity as an HHI director and officer. Moreover, although HHI points to Mr. Shapiro's allegedly improper conduct in an attempt to block his indemnification claim, the conduct standards to which HHI points apply only to permissible indemnification claims, not mandatory indemnification claims such as Mr. Shapiro's. Accordingly, it was error to

conclude that HHI's allegations of improper conduct prevent Mr. Shapiro from being indemnified for the expenses he incurred in successfully defending the Fraud Suit.

### 1. The Capacity Requirement

Maryland permits, and, in some cases, mandates, that a corporation reimburse its corporate officers and directors for their legal fees. This kind of claim, that is for reimbursement of reasonable expenses, including legal fees, after they are incurred, is known as "indemnification" and is distinct from a claim for "advancement," which is for the payment of reasonable expenses, including legal fees, before they are incurred. Regardless of whether a director's or officer's indemnification claim is for "permissible" or "mandatory" reimbursement, there must be some nexus between the "proceeding" for which indemnification is sought and the director's or officer's service to the corporation. This requirement, a predicate to recovery, is known as the "capacity requirement." Here, the crux of the parties' dispute is how substantial that nexus must be and whether Mr. Shapiro's conduct, as alleged, met it as a matter of law. Mr. Shapiro asserts that the nexus need only be "minimal" and that his conduct, as alleged, met it. HHI argues that the nexus must be more substantial and that the circuit court was correct to conclude that Mr. Shapiro's alleged conduct did not meet it.

We start with Maryland's corporate indemnification statute, § 2-418 of the C&A. Subsection (d) pertains to mandatory indemnification of a director. Unless limited by the corporation's charter, a director who is successful in their defense "of a proceeding

54

referred to in subsection (b)" must be indemnified,[42] and the court must order it.

Subsection (d) provides:

> (d) Unless limited by the charter:
>
> (1) A director who has been successful, on the merits or otherwise, in the defense of any proceeding referred to in subsection (b) of this section, or in the defense of any claim, issue, or matter in the proceeding, shall be indemnified against reasonable expenses incurred by the director in connection with the proceeding, claim, issue, or matter in which the director has been successful.
>
> (2) A court of appropriate jurisdiction, upon application of a director and such notice as the court shall require, may order indemnification in the following circumstances:
>
>> (i) If it determines a director is entitled to reimbursement under paragraph (1) of this subsection, the court shall order indemnification, in which case the director shall be entitled to recover the expenses of securing such reimbursement . . .

C&A § 2-418(d).

Subsection (b)(1) of § 2-418 defines when a corporation may permissibly indemnify directors, and it includes the "capacity requirement" at issue here. This subsection provides:

> (b)(1) A corporation may indemnify any director made a party to any proceeding by reason of service in that capacity unless it is established that:
>
>> (i) The act or omission of the director was material to the matter giving rise to the proceeding; and
>>
>>> 1. Was committed in bad faith; or

---

[42] Our Supreme Court has also clarified that to qualify for indemnification, the proceeding must be "an actual or threatened adjudicative or administrative process, or any stage of either process, including an investigation." *Kramer*, 408 Md. at 6.

2.  Was the result of active and deliberate dishonesty; or

(ii) The director actually received an improper personal benefit in money, property, or services; or

(iii) In the case of any criminal proceeding, the director had reasonable cause to believe that the act or omission was unlawful.

C&A § 2-418(b)(1).

Finally, while most of the statute focuses on indemnification of directors, subsection (j) provides for the indemnification of officers and employees as well. A corporation *shall* indemnify an officer to the same extent as a director and **may** indemnify an employee to the same extent as a director. Thus, a corporation may opt into indemnifying employees under this statute. Subsection (j) says:

(j) Unless limited by the charter:

(1) An officer of the corporation shall be indemnified as and to the extent provided in subsection (d) of this section for a director and shall be entitled, to the same extent as a director, to seek indemnification pursuant to the provisions of subsection (d) of this section;

(2) A corporation may indemnify and advance expenses to an officer, employee, or agent of the corporation to the same extent that it may indemnify directors under this section . . .

C&A § 2-418(j).

Before we return to the parties' dispute about the capacity requirement as applied to directors or officers, we dispose of Mr. Shapiro's "employee" argument. As we understand it, Mr. Shapiro argues that because his claim for indemnification arises under subsection (d), and because § 2-418 envisions indemnification of directors, officers, or

employees, he could, in the Fraud Suit, have been sued as an employee and still be owed indemnification. In other words, because he was due indemnification even as an employee, whether or not he met the capacity requirement for directors or officers doesn't matter. We disagree.

HHI's governing documents do not permit, and as a result, § 2-418 does not mandate, indemnification of HHI's employees, whether or not they are sued in their capacity as HHI employees. As above, § 2-418(j)(2) is an "opt-in" provision for employee indemnification. In other words, it provides that "unless limited by the charter," a corporation *may* indemnify employees to the same extent that it indemnifies officers and directors.

Here, HHI's indemnification promise,[43] which appears in the Eighth Article of its Articles of Amendment and Restatement, does not extend to employees. This Article provides:

---

[43] Courts consider a corporation's articles of incorporation to be "a contract between the corporation and its shareholders." *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 504 (2021); *see also Tackney v. U.S. Naval Acad. Alumni Ass'n*, 408 Md. 700, 716 (2009) ("It is a fundamental principle that the rules used to interpret statutes, contracts, and other written instruments are applicable when construing corporate charters and bylaws." (cleaned up)). Under contract law, we look to the objective intent of the parties to the contract to determine to what they agreed. *See Muhammad v. Prince George's Cnty. Bd. of Ed.*, 246 Md. App. 349, 364 (2020) ("Where the contract language is unambiguous, courts determine the intent of the parties based on an objective, reasonable person standard."). That HHI did not mention indemnification of employees in its charter demonstrates that HHI did not agree to indemnify employees. *See id.* If HHI had said it would indemnify its employees in its charter, it would be contractually obligated to do so and could be held liable for breach of contract for refusing, but HHI did not make such a promise. *See Impac Mortg. Holdings, Inc.*, 474 Md. at 504.

> The Corporation shall indemnify and advance expenses to all of its **present and former directors and officers** in connection with any proceeding (as such term is defined in Section 2-418 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended from time to time) to the fullest extent permitted by and in accordance with the laws of the State of Maryland.

(Emphasis added).

The Eighth Article's "fullest extent" provision means that HHI must indemnify directors and officers even where § 2-418 does not make such indemnification mandatory. However, this provision does not require HHI to indemnify those in the corporation for whom indemnification is not mandated by § 2-418(d). Because subsection (j) specifically leaves indemnification of employees up to the corporation, and employees are not included in subsection (d), indemnification is not mandatory. Accordingly, if Mr. Shapiro was sued in the Fraud Suit only in his capacity as an HHI employee, HHI was not required to indemnify him.

But Mr. Shapiro's relationship with HHI was not only as an employee. Returning to the parties' dispute about the "capacity requirement" as applied to HHI directors and officers, we note that at times, including the timeframe alleged in the Fraud Suit, Mr. Shapiro was a director and an officer of HHI. He argues that the capacity requirement— that a director or officer be sued by reason of his service in his capacity as director or officer in order to recover for indemnification— is a feature of subsection (b) and does not apply here because his claim for indemnification from HHI is under subsection (d)'s provision for mandatory indemnification. Conversely, HHI argues that to be granted indemnification as an officer or director under Maryland law, even mandatory

58

indemnification, Mr. Shapiro must have been sued "in his capacity" as an officer or director, pursuant to subsection (b).

The plain language of § 2-418(b) and (d) and our Supreme Court's holding in *Kramer* dispose of Mr. Shapiro's argument. To be sure, the capacity requirement is not repeated verbatim in subsection (d), but subsection (d)'s incorporation of subsection (b)'s reference to "proceeding" accomplishes the same thing, with the result that the capacity requirement is a predicate to indemnification under subsections (b) **and** (d). Subsection (d) mandates indemnification for "[a] director who has been successful, on the merits or otherwise, in the defense **of any proceeding referred to in subsection (b)** of this section[.]" C&A § 2-418(d) (emphasis added). Subsection (b), then, states that a director may be indemnified if they are "made a party to any proceeding **by reason of service in that capacity**." C&A § 2-418(b) (emphasis added).

In *Kramer*, which examined whether the trustee of a Real Estate Investment Trust ("REIT") should be awarded advancement, our Supreme Court confirmed that the capacity requirement applies throughout § 2-418. 408 Md. at 29. Although the "by reason of" language only occurs once in the statute in the subsection on permissible indemnification, *Kramer* read the "by reason of" requirement into the definitions of "party" and "proceeding," with the result that the "by reason of" requirement applies throughout the statute. *Id.* Thus, for a director to obtain indemnification or advancement, they must be a party to a proceeding "by reason of" their service in the capacity as a

director. *Id.* For Mr. Shapiro, this means that in order to recover, he must have been a party to the Fraud Suit by reason of his service as a director or officer of HHI.[44]

Mr. Shapiro next argues that if recovery under Maryland law requires he be sued by reason of his official capacity, there must only be "some minimal nexus" between the Fraud Suit and his official duties. He contends that this minimal nexus is established by any connection between the Fraud Suit and any of his official duties (such as only his employee duties) for HHI, simply because he was serving as an officer and director at the time of the alleged conduct. Therefore, he argues that even if HHI's allegations were directed at him as an employee *only*, that fact would establish the minimal nexus because there would be a causal connection between his official duties for HHI (albeit his employee duties) and the Fraud Suit, and because he was an officer or director at the same time.

HHI, on the other hand, argues that there must exist more than a minimal nexus under Maryland law. HHI claims that the appropriate standard to determine whether an individual was sued by reason of their service in their official capacity, and is thus

---

[44] We make no distinction between officer and director, as HHI's corporate articles indemnify both positions to the fullest extent under the law. The legislative history of C&A § 2-418 confirms this conclusion. *See Berry*, 469 Md. at 687-88 (looking to legislative history to confirm interpretation of the plain meaning of the statute); *Kramer*, 408 Md. at 22-23 (examining the language of the MBCA to confirm its interpretation of C&A § 2-418). Specifically, the MBCA Committee explained that directors who also serve as officers would be indemnified in both capacities, but they would only receive the benefits of the lower level of indemnification that all directors share. *See* Committee on Corp. Laws, *Changes in the Model Business Corporation Act Affecting Indemnification of Corporate Personnel*, 36 Bus. L. 99, 117 (1980); *see also Kramer*, 408 Md. at 22-23 (reviewing the same MBCA comments).

entitled to indemnification, is the standard set forth in *Kramer*: a nexus or causal connection. This nexus or causal connection is established when the corporate powers were used or necessary for the commission of the alleged conduct or when the suit was directed at the potential indemnitee in their official capacity. HHI also argues that under its governing documents, when read in line with C&A § 2-418, the nexus or causal connection must exist between the Fraud Suit and Mr. Shapiro's duties as an officer or director, not as an employee. Thus, in order for Mr. Shapiro to recover, HHI must have sued him by reason of his service as an officer or a director, not as an employee.

We agree with HHI that the required nexus for indemnification is more than the minimal connection to the corporation that Mr. Shapiro posits.[45] C&A § 2-418 permits indemnification for "any director made a party to any proceeding by reason of **service** in **that** capacity." C&A § 2-418(b) (emphasis added). Thus, the connection between the underlying proceeding and the director's service to the corporation must be through their capacity as director, such as their actions, knowledge, or powers as director, not just their general connection to the corporation. In *Kramer*, the court provided the example that an individual has been made a party to a proceeding by reason of their service in their

---

[45] When Mr. Shapiro argues there must only be some minimal nexus, he contends that that nexus is met simply by him serving as an officer and director during the time the alleged conduct was taking place. While other cases phrase the required causal connection as a "tangential" or minimal nexus, that connection must be more than Mr. Shapiro's proposed connection. *See Heffernan v. Pac. Dunlop GNB Corp.*, 965 F.2d 369, 375 (7th Cir. 1992) ("tangentially"). In fact, Mr. Shapiro's proposed connection—that he happened to serve as an officer or director during the alleged conduct—is no connection at all.

61

official capacity when "'the corporate powers were used or necessary for the commission of the alleged misconduct' giving rise to the 'proceeding.'" *Kramer*, 408 Md. at 29 (quoting *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1011 (Del. 2007)). This standard establishes that to qualify for indemnification for the defense of a proceeding, the misconduct alleged in the proceeding must be causally connected to the individual's service in that position, not just to the individual's service for the corporation in general while they happened to be serving in an indemnified capacity.

With regard to Mr. Shapiro's capacity in the Fraud Suit, HHI points to *Kramer* and argues that because there was no nexus between Mr. Shapiro's powers as a director or officer and his submission of false Tricare claims, he was not sued by reason of his service as a director or officer. Instead, argues HHI, Mr. Shapiro could have submitted the false claims in the normal course of his employment as an HBOT technician. In fact, the other HBOT technician employed by HHI (and who was not a director or officer) used this same process to submit claims. Therefore, HHI argues that Mr. Shapiro would not have had to invoke any special corporate powers outside the ordinary process followed by all employees.

In *Kramer*, on which HHI relies, our Supreme Court concluded that because there was no nexus between "the proceeding" and the trustee's status as a trustee of the REIT, there was no error in the circuit court's denial of the trustee's claim. "For a 'proceeding' to be by reason of one's official status, there must exist a nexus or causal connection between the underlying proceeding and one's official status." *Kramer,* 408 Md. at 29

62

(citing *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 214 (Del. 2005). The "proceeding" in that case was an internal investigation regarding the trustee's activities as the co-owner of a *different* entity. *Id.* at 10. The trustee's advancement claim failed because while the internal investigation was about the trustee, it was not about his service as a trustee of the REIT, i.e., by virtue of his capacity in the indemnified position with the REIT. *Id.* at 29. Instead, it was the trustee's co-ownership of the other entity that prompted the investigation. *Id.*

Here, by contrast, we cannot say, as our Supreme Court did in *Kramer*, that there was no nexus or causal connection between the Fraud Suit and Mr. Shapiro's status as a director and officer for HHI. The allegations that HHI made against Mr. Shapiro, if they had been sustained by the jury, would have amounted to an abuse of Mr. Shapiro's fiduciary duties and a misuse of his corporate knowledge, if not his corporate powers. While HHI alleged that this abuse and misuse was outside Mr. Shapiro's responsibilities, the allegations were still directed at conduct he allegedly accomplished by using his powers and knowledge as director and officer. Further, that a director or officer allegedly has a personal motivation does not mean they were only sued in their personal capacity to the exclusion of their capacity as an officer and director. One's motivation does not dictate in which capacity they were sued; rather, the allegations of conduct do. *See Perconti v. Thornton Oil Corp.*, No. CIV. A. 18630-NC, 2002 WL 982419 (Del. Ch. May 3, 2002) (holding that the director was entitled to indemnification because it was alleged he abused his corporate powers); *Homestore, Inc.*, 888 A.2d at 214 (awarding the officer

63

indemnification because it was alleged that he misused his corporate knowledge to carry out the scheme).

Delaware courts have often emphasized that an indemnitee's alleged personal motivation for the underlying conduct does not jeopardize their eligibility for indemnification. In other words, even if someone allegedly abused or misused their corporate powers, which they possess by reason of their indemnified capacity, that abuse or misuse does not negate the fact that those allegations are directed at the use of corporate powers and the indemnitee's service in their indemnified capacity. In *Perconti*, for example, the plaintiff director had been indicted for embezzlement, but after a mistrial, the United States dismissed all charges against him. *Perconti*, 2002 WL 982419, at *1. The director filed for indemnification for his expenses in defending the embezzlement suit, and the Chancery Court of Delaware granted him the requested indemnification. *Id.* at *10. The defendant company attempted to argue that the plaintiff director had not been charged by reason of the fact that he was a director. *Id.* at *7. It argued that the director had not been charged with breach of fiduciary duty but with violating federal criminal statutes. *Id.* The Chancery Court noted, however, that the indictment against the director set forth conduct that would have been a breach of his fiduciary duties as a director. *Id.* It said that the allegations of fact "amply demonstrate[] a course of abuse of [the director's] corporate position through a series of failures to comply with his fundamental duties to the corporation." *Id.*

Likewise, here, the fact that HHI alleged that Mr. Shapiro abused and misused his corporate powers as a director and officer means that HHI directed its allegations against Mr. Shapiro by reason of his service as an officer and director. HHI did not include in its Fraud Suit complaint a count against Mr. Shapiro for breach of his fiduciary duties;[46] however, an essential element of its claim was that Mr. Shapiro breached his fiduciary duty as an officer and director. HHI's complaint, in essence, was that Mr. Shapiro abused his position as an officer and director by taking advantage of HHI's trust in him, a trust he gained through those positions. As in *Perconti*, such allegations against Mr. Shapiro would have been based on his service as an officer and director. Thus, by focusing an essential element of its claim on Mr. Shapiro's breach of fiduciary duties, HHI sued him by reason of his service in the capacity of officer and director as a matter of law.

HHI's allegations are also similar to the allegations in *Homestore, Inc.*, 888 A.2d at 207. In that case, the plaintiff officer had been accused of inflating the corporation's revenues. *Id.* at 206-07. He argued that "any role he had in implementing or overseeing the challenged transactions was in his official capacity as an officer of the corporation." *Id.* at 207. The Delaware Supreme Court agreed and held that the officer had been a party

---

[46] Even if it wanted to, HHI may not have been able to bring a claim for breach of fiduciary duties because it was unclear whether Maryland recognized an action for breach of fiduciary duties until *Plank v. Cherneski*, 469 Md. 548, 597 (2020). Nevertheless, these facts are also similar to *Perconti* because there, the court held that not including an action for breach of fiduciary duties is not dispositive of a subsequent request for indemnification.

65

to the proceeding by reason of the fact that he was an officer, and it thus awarded him indemnification. *Id.*

As in *Homestore, Inc.*, where it was alleged that the officer inflated company revenues for his personal gain, here, HHI contended that Mr. Shapiro oversaw the Tricare billing to fraudulently gain more revenue (and that he knew how to do so) because he was President and CEO. Multiple times throughout its allegations, HHI implied that, as CEO, Mr. Shapiro used his supervisory authority over and knowledge of HHI's day-to-day operations to implement his alleged scheme.[47] It also alleged that Mr. Shapiro supervised Ms. Schrum, who sent Tricare the fraudulent claims.[48] HHI further alleged that Mr. Shapiro knew of the billing process and where the funds would go because he was an officer and director.[49] Plus, HHI alleged that Mr. Shapiro received an improper personal benefit because he was using the company's bank account as his personal bank account for the relevant period of time (which he admitted during a deposition) and that he used

---

[47] HHI alleged that Mr. Shapiro "controlled the day-to-day operations of [HHI.]"

[48] HHI alleged, "Subsequently, an internal audit uncovered that Hyperheal, under Shapiro's management, had engaged in the First Fraudulent Billing and Tricare improperly paid Hyperheal."

[49] HHI alleged, "As a shareholder and director that controlled the day-to-day operations of [HHI], [Mr.] Shapiro knew that Tricare paid [HHI] for the unattended HBOT sessions and he also knew that [HHI] paid [Ms. Schrum] a 7.5% commission from the Tricare payments."

his corporate powers to inflate his salary.[50] HHI directed these allegations at Mr. Shapiro's knowledge and powers as an officer and director. As in *Homestore, Inc.*, the fact that HHI alleged Mr. Shapiro misused his knowledge and power does not undo the fact that the allegations were directed at the knowledge and power that Mr. Shapiro had in his capacity as an officer and director. Accordingly, as in *Homestore, Inc.*, HHI sued Mr. Shapiro by reason of his service as an officer and director.

Further supporting this conclusion is the fraud theory that HHI put forth at trial. In its fraud count against Mr. Shapiro, HHI alleged that it was damaged because of Mr. Shapiro's actions as an HHI director, actions that HHI was justified in relying on because Mr. Shapiro was a director and officer who owed fiduciary duties to HHI. Specifically, HHI alleged that it relied "on Mr. Shapiro's actions" and that its "reliance . . . was justified because he was a founder, shareholder, [and] **director**, and [he] owed fiduciary duties to [HHI][;] and it had no knowledge [Mr.] Shapiro was engaging in acts outside his

---

[50] During its closing arguments, HHI argued that Mr. Shapiro was improperly inflating HHI's revenue so that he could take more money through his salary and the bank account:

> You're going to get a chance to look at the bank records. You're going to get a chance to look at the letters that were sent to Mr. Shapiro's accountant, the accountant for the company. And in that, they complained, his father complained. He says, I don't get it.

> There's all these expenses that are going through that aren't appropriate. He's artificially increased his salary up to $100,000 at that point in time. We never approved it. You're going to see the letters. It was never approved. That somehow Eric had not only brought this money in, he was taking the money back out again. That's why it was that he hid it. That's why he continued to make it go on.

employment and in breach of his fiduciary duties." (Emphasis added). Likewise, HHI emphasized Mr. Shapiro's position as director and officer and his fiduciary duties in its complaint by saying:

> At the time of [HHI's] formation, Shapiro was one of three directors and the majority owner. Shapiro controlled the day-to-day operations of [HHI]. As a director, Shapiro owed a duty of loyalty to [HHI] and a duty to not engage in any act or omission that was not in good faith, involved intentional misconduct, conduct he had reasonable cause to believe was unlawful, or any transaction from which he would derive any improper personal benefit.

That HHI relied on Mr. Shapiro because he was an HHI director and officer who owed it fiduciary duties means that Mr. Shapiro was sued in his capacity as a director and officer.

HHI's jury instruction requests were also premised on Mr. Shapiro's being an officer and director. The "breach of trust" instruction that HHI got told the jury of the fiduciary relationship that being an officer and director entailed, and instructed that the fiduciary relationship required disclosure "in order to avoid any breach of trust."[51] In addition to being instructed that directors and officers were required to make disclosures to avoid breaches of trust, the jury was also told that in order to recover on its fraud

---

[51] In whole, the jury instruction on fiduciary relationship said:

> An **officer** and **director** of a corporation occupies a fiduciary relationship as regards to that corporation that requires a disclosure in order to avoid any breach of trust.

(Emphasis added).

68

count, HHI would have to prove that it "did **justifiably rely** on the representations of [Mr. Shapiro][,]" among other elements.[52]

In sum, there was a nexus or causal connection between the Fraud Suit and Mr. Shapiro's status as a director and officer. Multiple allegations in the Fraud Suit were directed at Mr. Shapiro as an HHI director and officer. HHI sued him by reason of his service to HHI in the capacity of officer and director. Accordingly, we conclude that Mr. Shapiro met the capacity requirement in the Fraud Suit.

We now focus on the potential impact of the allegations that HHI made against Mr. Shapiro in a non-indemnified status, i.e., in his capacity as an employee. In other words, we ask whether a corporate director sued in his capacity as such loses his eligibility for indemnification because he is simultaneously sued in a non-indemnified

---

[52] In whole the jury instruction on intentional misrepresentation or deceit said:

To recover damages for deceit, it must be shown that:

(1) the defendant made a false representation of a material fact;

(2) the defendant knew of its falsity or made it with such reckless indifference to the truth that it would be reasonable to charge the defendant with knowledge of its falsity;

(3) the defendant intended that the plaintiff would act in reliance on such statements[;]

(4) plaintiff did **justifiably rely** on the representations of the defendant; and

(5) plaintiff suffered damages as a result of that reliance.

(Emphasis added).

69

capacity. We look first to the plain language of § 2-418 and then to Delaware cases, as it appears that Maryland has not addressed this issue in case law.

Under its plain language, § 2-418 does not limit indemnification to one sued in an indemnified capacity if they are also sued in a non-indemnified capacity. This absence is telling given that the General Assembly did limit indemnification at another point in the statute. *See Maryland-Nat'l Cap. Park & Plan. Comm'n v. Anderson*, 395 Md. 172, 190 (2006) (where legislature establishes judicial review for an administrative agency finding, absence of judicial review for the contrary finding is indicative of legislature's intent not to create that remedy). Specifically, § 2-418(c) prohibits permissible indemnification to a director charged with, and found liable for, having received a personal benefit, regardless of whether that director was sued in his official capacity. C&A § 2-418(c). Thus, while the General Assembly knew how to limit indemnification, it imposed no such limit for those sued in multiple capacities, some indemnified, some not. *See also Holley v. Nipro Diagnostics, Inc.*, No. CA 9679-VCP, 2014 WL 7336411 (Del. Ch. Dec. 23, 2014) (interpreting Delaware's analogous statute and finding that if the Delaware legislature had wanted to add a requirement that a director be acting in the best interest of the corporation, it would have done so). To confirm this interpretation, we next look to Delaware law, as its statute is constructed similarly to ours, and we consider it an expert in the area.

70

Delaware's courts[53] have on multiple occasions held that someone may be awarded indemnification even though they were sued in multiple capacities, one or some of which were not indemnified. *See, e.g.*, *Davis v. EMSI Holding Co.*, No. CV 12854-VCS, 2017 WL 1732386 (Del. Ch. May 3, 2017) (indemnifying plaintiffs who held indemnified positions at one company and non-indemnified positions at another company); *Weil v. VEREIT Operating P'ship*, No. CV 2017-0613-JTL, 2018 WL 834428 (Del. Ch. Feb. 13, 2018) (providing advancement for plaintiffs who held indemnified positions at one company and non-indemnified positions at another company); *Heffernan v. Pac. Dunlop GNB Corp.*, 965 F.2d 369, 375 (7th Cir. 1992) (applying Delaware law in denying motion to dismiss); *Kapoor v. Fujisawa Pharm. Co.*, No. C.A. 93C-06-50, 1994 WL 233947, at *7 (Del. Super. Ct. May 10, 1994), *aff'd*, 655 A.2d 307 (Del. 1995) (that a director is sued in more than one capacity does not mean that they cannot be indemnified as a director for the entirety of the underlying case).

*EMSI Holding Company* is instructive. There, the plaintiffs requesting indemnification held indemnified positions in one company and positions that were not indemnified in that company's subsidiary. No. CV 12854-VCS, 2017 WL 1732386 at *7,

---

[53] Minnesota has reached the same conclusion. *Barry v. Barry*, 28 F.3d 848, 851 (8th Cir. 1994) (interpreting Minnesota law and explaining that "[w]hile we recognize that Lieberman's allegations also address actions taken by defendants in their capacities as controlling shareholders [as well as directors], we agree with the district court that the mere fact that the Swartzes wore two hats in their dealings with Twin City Fan and with Lieberman does not compel the conclusion that they were not sued, at least in part, because of their official status." (cleaned up)).

n. 25. Delaware's Court of Chancery found that "the complaint in the underlying action allege[d] a wide-ranging fraudulent scheme perpetrated by Plaintiffs while they were serving as officer and directors of **both** entities and makes no effort to distinguish between entities when describing the fraud." *Id.* (emphasis added). Thus, while the plaintiffs held some positions that were indemnified and some that were not, the company's suit against them was directed at alleged actions taken in all their positions, with no distinction among which capacities led to which counts. *Id.*

As above, HHI sued Mr. Shapiro in his capacity as a director and officer of HHI. He meets the capacity requirement as such. The fact that "as a director and officer" was not the only capacity in which he was sued does not eliminate his eligibility for indemnification as an HHI director and officer. HHI has not convinced us otherwise.

## 2. Subsection (b)'s Improper Conduct Provision

HHI next argues that even if Mr. Shapiro does meet the capacity requirement for indemnification, his claim nonetheless fails because he did not meet Section 2-418's conduct requirements. Specifically, HHI contends that subsection (b)'s conduct requirements are incorporated into subsection (d), meaning that indemnification is mandatory for a director who received a jury verdict in their favor, *unless* the company proves that the director acted in bad faith, acted with active and deliberate dishonesty, or received an improper personal benefit. HHI then argues that it did prove that Mr. Shapiro acted in bad faith, acted with active and deliberate dishonesty, or received an improper personal benefit. By submitting false claims and acting as a physician, Mr. Shapiro acted

72

in bad faith and with active and deliberate dishonesty. HHI also argues that since Mr. Shapiro was using the company bank account, which gained funds from the false Tricare claims, as his personal bank account during the relevant time, he received an improper personal benefit from the false claims.

Mr. Shapiro counters that subsection (b)'s conduct requirements do not apply to his subsection (d) mandatory indemnification claim. Looking to subsection (d)'s plain language, Mr. Shapiro reminds us that the jury found in his favor in the Fraud Suit and he was "successful, on the merits or otherwise, in the defense" of the proceeding. Otherwise, he contends that if subsection (b)'s conduct requirements do apply, there is at least a genuine dispute of fact regarding whether his conduct met those requirements.

We agree with Mr. Shapiro that subsection (b)'s conduct requirements do not apply to a mandatory indemnification claim under subsection (d). Read as a whole, § 2-418's plain language establishes two separate remedies: under subsection (b), permissible indemnification for directors whose corporations elect to indemnify them and whose conduct does not disqualify them; and, under subsection (d), mandatory indemnification for directors successful in their defense. A director who is successful in their defense (and who meets the capacity requirement) need not relitigate the propriety of his conduct in order to be indemnified.

Section 2-418(d)(2) makes clear that subsection (b)'s conduct requirements play no part in the court's award of mandatory indemnification to a successful director who meets the capacity requirement. Specifically, subsection (d)(2)(i) and (ii) distinguish the

73

indemnification a court **must** award under subsection (d)(1) to a successful director from indemnification that a court **may** award. Subsection (d) provides in whole:

(d) Unless limited by the charter:

(1) A director who has been successful, on the merits or otherwise, in the defense of any proceeding referred to in subsection (b) of this section, or in the defense of any claim, issue, or matter in the proceeding, shall be indemnified against reasonable expenses incurred by the director in connection with the proceeding, claim, issue, or matter in which the director has been successful.

(2) A court of appropriate jurisdiction, upon application of a director and such notice as the court shall require, may order indemnification in the following circumstances:

(i) If it determines a director is entitled to reimbursement under paragraph (1) of this subsection, the court shall order indemnification, in which case the director shall be entitled to recover the expenses of securing such reimbursement; or

(ii) if it determines that the director is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the director has met the standards of conduct set forth in subsection (b) of this section or has been adjudged liable under the circumstances described in subsection (c) of this section [pertaining to receipt of an improper personal benefit], the court may order such indemnification as the court shall deem proper. However, indemnification with respect to any proceeding by or in the right of the corporation in which liability shall have been adjudged in the circumstances described in subsection (c) of this section shall be limited to expenses.

C&A § 2-418(d)(2).[54] Thus, for a director that meets the capacity requirement, mandatory indemnification hinges only on the director's success in the proceeding. Permissible indemnification, i.e., reimbursement for a director who meets the capacity requirement but who was not successful in defending the proceeding, requires that the court consider "all the relevant circumstances," including whether that director has met subsection (b)'s standards of conduct, among other circumstances.

Subsection (c) also shows that subsection (b)'s conduct requirements do not affect mandatory indemnification under subsection (d). Subsection (c) prohibits permissible indemnification to a director charged with, and found liable for, having received a personal benefit, regardless of whether that director was sued in his official capacity, but subsection (c) does not extend its "improper personal benefit" prohibition to mandatory indemnification under subsection (d). Subsection (c) provides:

> A director may not be indemnified **under subsection (b) of this section** in respect of any proceeding charging improper personal benefit to the director, whether or not involving action in the director's official capacity, in which the director was adjudged to be liable on the basis that personal benefit was improperly received.

(Emphasis added). Nor does subsection (c) apply its "improper personal benefit" prohibition to those who, like Mr. Shapiro, were adjudged not liable.[55]

---

[54] A director may seek indemnification under subsection (d)(2)(ii) if the corporation denies their request for permissible indemnification under subsection (b) **and** they are not successful in their defense of the underlying proceeding.

[55] Presumably, if the General Assembly had intended the "improper personal benefit" prohibition, certainly one kind of conduct requirement under subsection (b), to

Delaware interprets its corporate indemnification statute the same way. In multiple

instances, Delaware courts have granted indemnification despite the indemnitee's alleged

personal motivation behind the conduct. Returning to *Perconti*, the Delaware Court of

Chancery granted the director indemnification after he successfully defended against a

criminal charge for embezzlement. 2002 WL 982419, at *1. The director's codefendant

even pled guilty to the embezzlement; however, the director went to trial, which ended

after the jury failed to reach a unanimous verdict. *Id.* After the declaration of the mistrial,

the United States dismissed all charges against the director. *Id.* Although the corporation

still believed that the director was guilty of embezzling, the court granted him

indemnification. *Id.* at *4. It explained that the Delaware mandatory indemnification

statute, which is the equivalent of C&A § 2-418, "assures indemnification to the

corporate officer who has been 'successful' in the criminal proceeding. It does not require

a determination that the corporate officer was 'innocent.'" *Id.*; *see also Green v. Westcap

Corp. of Del.*, 492 A.2d 260, 265 (Del. Super. Ct. 1985) ("[W]hen considering the

reference in subsection (c) to 'any action, suit or proceeding referred to in subsections (a)

and (b)' the conclusion is that the only portion of subsection (a) and (b) which is

incorporated by reference is the portion which defines the type of action, suit or

proceeding covered by each section and that that reference does not incorporate the

---

apply to mandatory indemnification under subsection (d), it would have said as much in
subsection (c).

76

subsequent qualification [i.e., the requirement of good faith,] required for indemnification.").

HHI's focus on subsection (d)(1)'s reference to subsection (b) — "in the defense of any proceeding referred to in subsection (b) of this section, . . ."— is not persuasive if for no other reason than it fails to account for the rest of the statute. C&A § 2-418; *Brooks ex rel. Wright v. Hous. Auth. of Balt. City*, 411 Md. 603, 621 (2009) ("We first look at the normal, plain meaning of the language of the statute, and we read it as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." (cleaned up)). To be sure, subsection (b) lays out the conduct requirements that HHI relies on and that prohibit or limit permissible indemnification to a director who fails any one of them. But HHI's focus on subsection (b) fails to account for subsubsections (d)(2)(i) and (d)(2)(ii), which, when read together, explicitly do not apply subsection (b)'s conduct requirements to indemnification of a successful director under subsection (d)(1).

In certain instances—possibly even in the one before us—the award of indemnification may feel counterintuitive. In a case concerning advancement, the Delaware Court of Chancery aptly explained this feeling and why we, as courts, should resist it:

> Corporate advancement practice has an admittedly maddening aspect. At the time that an advancement dispute ripens, it is often the case that the corporate board has drawn harsh conclusions about the integrity and fidelity of the corporate official seeking advancement. The board may well have a firm basis to believe that the official intentionally injured the corporation. It therefore is reluctant to advance funds for his defense, fearing that the funds

77

will never be paid back and resisting the idea of seeing further depletion of corporate resources at the instance of someone perceived to be a faithless fiduciary.

But, to give effect to this natural human reaction as public policy would be unwise. Imagine what EDS believes to be unthinkable: that the United States government and EDS are in fact wrong about Reddy. What if he in fact did not falsify records? What if he in fact did not do anything that was even grossly negligent? In that circumstance, it would be difficult to conceive of an argument that would properly leave him holding the bag for all of his legal fees and expenses resulting from two cases centering on his conduct as an employee of EDS. That result would make the promise made to Reddy in the EDS bylaws an illusory one.

For these reasons, this court has often been required to uphold the indemnification and advancement rights of corporate officials accused of serious misconduct, because to do otherwise would undermine the salutory [*sic*] public policies served by [the indemnification statute].

*Reddy v. Elec. Data Sys. Corp.*, No. CIV.A.19467, 2002 WL 1358761, at *5-*6 <u>(Del. Ch. June 18, 2002)</u>.

Therefore, because Mr. Shapiro brought his Indemnification Suit under subsection (d), the court erred by ruling that subsection (b)'s improper conduct provisions prevented Mr. Shapiro's recovery. In doing so, the court looked behind the jury verdict in the Fraud Suit and undermined the judgment already entered in Mr. Shapiro's favor. *See Safeway Stores, Inc. v. Nat'l Union Fire Ins. of Pittsburgh, Pa.*, 64 F.3d 1282, 1290, n.24 (9th Cir. 1995) ("It is logical to conclude that in a situation covered by subsection (d), a formal determination that indemnification is proper would be unnecessary; because the director has been exonerated, or at least not been held liable, no proof of her good faith would be required."); *Reddy*, 2002 WL 1358761, at *6 ("For these reasons, this court has often been required to uphold the indemnification and advancement rights of corporate officials

78

accused of serious misconduct, because to do otherwise would undermine the salut[a]ry public policies served by [the indemnification statute].”); *Westcap Corp. of Del.*, 492 A.2d at 265 (“Hence, in the absence of success on the merits of the defense, there is a requirement that specific factual prerequisites be established as a condition for indemnification. Subsection [(d)] applies only where there has been a prior proceeding in which the lack of merit of the attack upon the indemnitee has been established.”).

Here, it is beyond dispute that Mr. Shapiro successfully defended the Fraud Suit. Because HHI brought the Fraud Suit against Mr. Shapiro by reason of his service as an HHI director and officer, at least in part, summary judgment in HHI’s favor on Mr. Shapiro’s mandatory indemnification claim was inappropriate. Accordingly, we reverse and remand the Indemnification Suit to the circuit court for further proceedings not inconsistent with this opinion.

## CONCLUSION

In sum, we affirm some of the circuit court’s judgments and reverse others. Regarding Mr. Shapiro’s employment counts, we affirm the circuit court’s dismissal because Mr. Shapiro should have brought them as compulsory counterclaims in the IP Suit. Regarding his email counts, we affirm the circuit court’s grant of summary judgment on the counts concerning intrusion upon seclusion and Maryland’s Wiretapping and Electronic Surveillance Act because Mr. Shapiro did not offer any evidence that anyone read or otherwise intercepted his emails. However, we reverse the circuit court’s grant of summary judgment on Mr. Shapiro’s Stored Electronic Communications Act

count because Mr. Hughey's download of Mr. Shapiro's email constituted either access without authorization or exceeding the authorization Mr. Shapiro had previously given to HHI. We also reverse the circuit court's grant of summary judgment in Mr. Shapiro's Indemnification Suit because HHI brought the Fraud Suit against Mr. Shapiro by reason of his service in his capacity as an officer and director, at least in part, and Mr. Shapiro was successful in the Fraud Suit.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY DISMISSING COUNTS I AND II IN C-03-CV-21-000844 AFFIRMED; JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IN C-03-CV-21-000844 AFFIRMED AS TO COUNTS III AND VI AND REVERSED AS TO COUNT V; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IN C-03-CV-22-000090 REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE-HALF BY APPELLANT AND ONE-HALF BY APPELLEES.**